# IN THE SUPREME COURT, STATE OF WYOMING

## 2015 WY 11

OCTOBER TERM, A.D. 2014

*January 15, 2015*

JENNIFER MOORE, d/b/a SILLY
BEAR DAYCARE, and WILLIE
MOORE, III,

Appellants
(Defendants),

v.                                                                              S-14-0168

MICHAEL WOLITITCH, DEBORAH
WOLITITCH, MICHAEL P.
BUNTEN, BARBARA J. HANDLEY,
and PAMELA JERKE,

Appellees
(Plaintiffs).

*Appeal from the District Court of Laramie County*
*The Honorable Thomas T.C. Campbell, Judge*

*Representing Appellants:*
Donna D. Domonkos of Domonkos Law Office, LLC, Cheyenne, Wyoming

*Representing Appellees:*
James R. Salisbury and Anthony M. Reyes of Riske & Salisbury, P.C., Cheyenne, Wyoming. Argument by Mr. Reyes.

*Before BURKE, C.J., and HILL, KITE, DAVIS, JJ., and GOLDEN, J., (Ret.)*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third.  Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GOLDEN**, Justice (Ret.).

[¶1]    Plaintiffs, several residents in the Milatzo Subdivision in Cheyenne, Wyoming, filed a complaint against Defendants Jennifer Moore, d/b/a Silly Bear Daycare, and Willie Moore, III, seeking to permanently enjoin Defendants from operating a daycare business out of their residence in the Milatzo Subdivision.  The district court found that Defendants' daycare operation violated the protective covenants governing properties in the Milatzo Subdivision, that those covenants had not been abandoned, and that the violation harmed Plaintiffs.  Based on those findings, the court granted Plaintiffs' request for a permanent injunction enjoining Defendants from operating a daycare business out of their residence.  We affirm.

## ISSUES

[¶2]    Defendants present a single issue for this Court's review, which they state as follows:

> Whether the district court's finding that the covenants in Milatzo Subdivision have not been abandoned is clearly erroneous.

## FACTS

[¶3]    On August 31, 2012, Defendant Willie Moore obtained title to a home located in the Milatzo Subdivision in Cheyenne, Wyoming.  The home is subject to protective covenants that were recorded on June 27, 1979.  The protective covenants specify in Paragraph No. 1 that "[n]o lot shall be used except for residential purposes," and they further state in Paragraph No. 17 that "[n]o residential lot shall be used as a business."

[¶4]    In September 2012, Defendants began operating the Silly Bear Daycare out of their home.  Defendant Jennifer Moore is the sole owner of the daycare business and is licensed to provide care for up to fifteen children.  She has one employee to assist in the operation.

[¶5]    On October 17, 2012, Plaintiffs, several residents in the Milatzo Subdivision, filed a complaint seeking preliminary and permanent injunctive relief to enjoin Defendants from operating a daycare business out of their residence. On October 19, 2012, Plaintiffs filed an amended complaint seeking the same relief.  Plaintiffs alleged that Defendants' daycare operation violated the protective covenants' provisions that limited use of property in the Milatzo Subdivision to solely residential uses and prohibited the use of any such property as a business.

1

[¶6]   On October 30, 2012, Defendants filed an answer by which they asserted affirmative defenses that the protective covenants had been abandoned and that Plaintiffs' enforcement action was racially motivated by Defendants' racially-mixed marriage. Defendants also asserted a counterclaim for damages caused by the alleged racially motivated enforcement action.

[¶7]   On November 28, 2012, the district court issued an order denying Plaintiffs' request for a temporary restraining order based on its finding that Plaintiffs had not met their burden of showing irreparable harm.  A bench trial was held on September 3, 2013, and on May 21, 2014, the court issued an order granting Plaintiffs a permanent injunction and dismissing Defendants' counterclaim.  In so ruling, the court found, in part and with citations omitted:

> 10.   The Defendants did not establish the abandonment of the covenants.  The incidental in-home meetings, parked work trucks, or phone numbers associated with businesses do not make out wholesale abandonment or even a credible argument that substantial, permanent, business activities were being conducted by others.  Plaintiffs' testimony was credible and realistically conveyed the history of the neighborhood.  Clearly whatever occasional or incidental conduct of business was not substantial or routine.  Nor were the handful of set-back or lot line discrepancies evidence of activity that would indicate the nature of the neighborhood created by the Subdivision covenants was changed or that the purpose of the covenants in question had been defeated.
>
> 11.   In contrast the Defendants['] use is a substantially more direct affront to the covenant.  They operate a licensed full time business, advertise it as such, and have employees on site.  By the very nature of the business, customers are coming and going from the neighborhood twice a day each.  The harm resulting [from] this purposeful violation is more than sufficient to justify relief.
>
> 12.   The Defendants having flagrantly ignored what they knew to be a restriction on their use of the property weighs heavily against their argument, now that they have been confronted, that other owners had also violated a number of the Subdivision covenants.  They did not act in good faith and equity weighs against them.  The Plaintiffs are harmed in an ongoing and permanent way and are entitled to equitable relief.

[¶8]    On June 5, 2014, Defendants timely filed their Notice of Appeal to this Court.

## STANDARD OF REVIEW

[¶9]    "Following a bench trial, we review the trial court's findings of fact for clear error, and its conclusions of law *de novo*." *Clark v. Ryan Park Prop. & Homeowners Ass'n*, 2014 WY 169, ¶ 6, ___ P.3d ___, ___ (Wyo. 2014) (quoting *Fox v. Wheeler Elec., Inc.*, 2007 WY 171, ¶ 9, 169 P.3d 875, 878 (Wyo. 2007)).  We have further explained:

> The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*Miner v. Jesse & Grace, LLC*, 2014 WY 17, ¶ 17, 317 P.3d 1124, 1131 (Wyo. 2014) (quoting *Claman v. Popp*, 2012 WY 92, ¶ 22, 279 P.3d 1003, 1012 (Wyo. 2012)).

[¶10]  Finally, in reviewing the evidence, "we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it." *Miner*, ¶ 17, 317 P.3d at 1131 (quoting *Claman*, ¶ 22, 279 P.3d at 1012).

## DISCUSSION

[¶11]  On appeal, Defendants do not challenge the district court's dismissal of their race discrimination claims, the court's finding that their daycare operation is a business, as that term is used by the protective covenants, or the court's finding that the daycare operation harms Plaintiffs.  Defendants' sole challenge is to the court's finding that the protective covenants were not abandoned. In appealing that ruling, Defendants make two arguments: A) that the court erred in finding that existing covenant violations were not sufficient to warrant a finding that the covenants were abandoned; and B) that the court erred in finding that equity weighs against Defendants because they flagrantly ignored the restriction on operating a business in the Milatzo Subdivision.  We will first address the abandonment finding and then turn to the court's equity finding.

**A.      Abandonment Finding**

[¶12]  Whether a protective covenant has been abandoned as a result of acquiescence in violations of the covenant is a question of fact that depends on the particular circumstances of each case. *Keller v. Branton*, 667 P.2d 650, 654 (Wyo. 1983).  To find an abandonment, the violations acquiesced in must be

> so great, or so fundamental or radical as to neutralize the benefits of the restriction to the point of defeating the purpose of the covenant. In other words, the violations must be so substantial as to support a finding that the usefulness of the covenant has been destroyed, or that the covenant has become valueless and onerous to the property owners.

*Hammons v. Table Mountain Ranches Owners Ass'n*, 2003 WY 85, ¶ 14, 72 P.3d 1153, 1156 (Wyo. 2003) (quoting *Keller*, 667 P.2d at 654.)

[¶13]  This Court has further explained that for a change in the neighborhood to justify a finding of abandonment, the "change must be of a radical and permanent nature." *Keller*, 667 P.2d at 654 (quoting 7 Thompson on Real Property, § 3174 (Bobbs-Merrill Co., Inc. (1962)).  "Where a violation is immaterial, minor, unoffensive, or remote from the land, no acquiescence will be presumed." *Keller*, 667 P.2d at 654 (citing 7 Thompson on Real Property, § 3173).  Finally, the burden of proving a change in the neighborhood is on the party asserting the protective covenant's abandonment. *Keller*, 667 P.2d at 654 (citing *Moore v. McDaniel*, 362 N.E.2d 382 (Ill. App. 1977)).

[¶14]  In support of Defendants' allegation that the protective covenants governing the Milatzo Subdivision were abandoned, Defendant Jennifer Moore testified to numerous trailers, sheds, boats, unregistered vehicles, and other items present on various properties throughout the Milatzo Subdivision.  On appeal, Defendants cite to additional testimony showing:

-- the keeping of a yard shed by Plaintiffs Michael and Deborah Wolititch that is located eight feet from the side property line rather than the ten feet required by the covenants;

-- Deborah Wolititch's babysitting of up to two to three children at a time, which children were unrelated to her and for which service she was compensated;

-- the operation of an identity theft victim assistance business by Milatzo Subdivision resident Becky Burney and her hosting of presentations related to that business;

4

-- the keeping of a yard shed by Plaintiff Barbara Handley that is located less than the required ten feet from the property line;

-- the keeping of two trailers on her property by Plaintiff Barbara Handley, which is in excess of the one trailer permitted by the covenants;

-- the use by Plaintiff Michael Bunten of his home address in the Milatzo Subdivision as his business address;

-- the keeping by Plaintiff Michael Bunten of a trailer and storage of landscaping equipment at his home;

-- the occasional meeting with crew members at the home of Plaintiff Michael Bunten before leaving to go to a job site;

-- the keeping by subdivision resident Charles Baca of a trailer advertising "Pro Baca Windows and his keeping of four or five vehicles;"

-- the keeping of two trailers on her property by Plaintiff Pamela Jerke, which is in excess of the one trailer permitted by the covenants; and

-- a failure to maintain the Building and Covenant Committee called for in the covenants.

[¶15] In its ruling, the district court described the existing business activities of the Milatzo Subdivision residents as occasional or incidental and found that they were not the type of substantial, routine, and permanent business activities that would change the nature of the neighborhood. The court likewise rejected the other alleged violations as evidence that the nature of the neighborhood had been changed or that the purpose of the covenants had been defeated. Based on our review of the record, we find no clear error in the district court's conclusions.

[¶16] With respect to the vehicles, trailers, campers, and boats that are present on subdivision property in alleged violation of the protective covenants, Defendants presented no evidence concerning how long the items had been present, whether they were permanent, temporary, or transitory, and how the presence of the items impacted the neighborhood. That is, Defendants failed in their burden of showing that these alleged violations caused a change in the neighborhood that was of a "radical and permanent nature." *See Keller*, 667 P.2d at 654.

[¶17] We find a similar failing in Defendants showing with respect to the presence of yard sheds that do not comply with the covenants' set back or aesthetic requirements. While Defendants presented evidence of the violations, they presented no evidence of the

5

impact that the handful of non-compliant yard sheds has had on the neighborhood and certainly no evidence that the violations are "so great, or so fundamental or radical as to neutralize the benefits of the restriction to the point of defeating the purpose of the covenant." *See Hammon*, ¶ 14, 72 P.3d at 1156.

[¶18] Defendants' evidence concerning other business activities in the Milatzo Subdivision also fell short of proving that the protective covenants had been abandoned. In particular, Defendants again failed to show how the subdivision was impacted by the cited business activities, such as the babysitting of two to three children, the use of a home address to receive business mail, the parking of a work vehicle and trailer carrying work equipment, the occasional meeting with a work crew at home, or the operation of an identity theft assistance business. The record is devoid of evidence showing that these activities radically and permanently changed the Milatzo Subdivision.

[¶19] In fact, the evidence showed that the existing business uses did not cause the traffic impacts with which Plaintiffs were concerned. For example, Rebecca Burney, the resident who operates the identity theft assistance business, and who was one of Defendants' witnesses, described her business as follows:

> Q. And what does that business entail?
>
> A. It's direct sales to provide legal opportunities for people who need – who need attorneys or attorneys' advice and that, and we supply that.
>
> Q. And do you conduct business in your home?
>
> A. Yes. Well, most of it, I should say.
>
> Q. Okay. And explain, when you are conducting business, what are you doing?
>
> A. We have what's called a private business reception. It's – we invite friends and neighbors and acquaintances to come to the house and present the program to them. I serve, you know, serve some desserts or whatever, and we have questions. There is a presentation and an opportunity to sign up.

[¶20] Rebecca Burney testified that she has reduced her time spent on her business to approximately six hours a month, that when she first began her business she gave one presentation per month at her home, that she has not given a presentation at her home in

two years, and that the last time any traffic could be attributed to her business activities would have been two years ago. On cross-examination, Ms. Burney further testified:

> Q. Now, you're aware that the Silly Bear Daycare is operating in your neighborhood; is that right?
>
> A. She's right across the street.
>
> Q. And you'd agree with me, wouldn't you, that the Silly Bear Daycare is different than your business, isn't it?
>
> A. Definitely. She's depending on it for income.
>
> Q. And it's open more hours a day?
>
> A. I would assume, yes.
>
> Q. Open for more hours a month, we'll say?
>
> A. Uh-huh.
>
> Q. And just so we're clear, have you seen an increase in traffic since the daycare has opened?
>
> A. I see cars that come and drop children off in the morning, and I see cars that come and pick them up in the evening, or afternoon.
>
> Q. Is that a yes?
>
> A. Yeah.

[¶21] Plaintiff Michael Bunten testified that he uses his home address in the Milatzo Subdivision as the mailing address for his landscaping business. He further testified:

> Q. Do you run the business out of your house?
>
> A. No. That's impossible.
>
> Q. Why do you say that's impossible?
>
> A. I can't, like, put somebody's yard in and then take it to their house.

7

Q.      So you leave your house.

A.      Yes.

Q.      Do your clients ever come to your house?

A.      No.

Q.      Do you sell anything out of your house?

A.      No.

Q.      Do you assemble or produce anything at your home?

A.      No.

[¶22]  On cross-examination, Michael Bunten testified:

Q.      Mr. Bunten, with your landscaping business, do you have a crew?

A.      Yes.

Q.      And does that crew come to your house in the morning?

A.      No.  Actually, they came into my house to paint my house.

Q.      Okay.  So your crew has never come to your house to get with you to go to the property that you're landscaping?

A.      I can't say never.  They probably have a few times.

Q.      A few times?

A.      Uh-huh.  And they walk.

Q.      Okay.

A.      Because they live two blocks from me.

8

> Q.    Do you store any of the equipment for Bunten Landscaping at 719 Angie Street?
>
> A.    Yes.
>
> Q.    And do you have a trailer that you carry equipment for Bunten Landscaping?
>
> A.    Yes.
>
> Q.    And where do you park that trailer?
>
> A.    In the driveway or out front.

[¶23]  The evidence shows that the traffic impact from these existing business activities is negligible to nonexistent, and Defendants presented no other evidence of impacts to the neighborhood.  In short, Defendants presented no evidence that existing business activities in the subdivision have radically and permanently changed the neighborhood, and they thus failed to prove that any acquiescence in those activities would support a finding that the covenants were abandoned.

[¶24]  We turn last to Defendants' argument that the nonexistence of the Buildings and Covenants Committee called for by the covenants means the covenants have been abandoned.  This argument fails for much the same reason as Defendants' arguments based on alleged neighbor violations of the covenants.  Defendants simply presented no evidence that the lack of a Buildings and Covenants Committee has resulted in a radical and permanent change to the Milatzo Subdivision such that the covenants' objectives have been essentially defeated.

[¶25]  The covenants themselves provide a further basis to reject Defendants' committee argument.  While the covenants do provide that the Buildings and Covenants Committee "shall supervise the enforcement and validation of these minimum property restrictions," they do not vest that enforcement authority solely in the committee.  The covenants instead specifically provide for other means of enforcement:

> Enforcement shall be proceedings at law or in equity against any person or persons violating or attempting to violate any covenant either to restrain violation or to recover damages.  It shall be lawful for the Developer acting in behalf of the community or any individual in his own behalf to prosecute such proceedings at law or in equity.

[¶26]  The protective covenants governing the Milatzo Subdivision do not condition their enforcement on action or review by the Buildings and Covenants Committee or even on the committee's continued existence.  In the absence of a showing that the nonexistence of the committee has permanently and radically changed the neighborhood and defeated the purpose of the covenants, we cannot agree that the committee's nonexistence renders the covenants abandoned or otherwise inapplicable.  In this regard, we agree with the reasoning expressed in a New Mexico Court of Appeals decision rejecting a property owner's argument that the lack of an architectural control committee voided covenants restricting property to residential uses:

> The fact that the ACC fell into disuse does not excuse compliance with the remainder of the covenants. Covenants impose binding obligations upon owners in planned subdivisions. Defendant's dog boarding and training businesses clearly violate the covenants limiting subdivision lots to residential purposes and prohibiting the maintenance of dogs for commercial purposes. Defendant's construction of a large commercial building clearly violates the covenant allowing only single-family residential and related structures. A court, sitting in the place of the ACC, cannot ignore the explicit prohibitions in the covenants.  The lack of an active ACC did not, of itself, permit Defendant to violate clear prohibitions in the restrictive covenants

*Myers v. Armstrong*, 324 P.3d 388, 391 (N.M. App. 2014) (citations omitted).

## B.    Equity Finding

[¶27]  Defendants asserted as an affirmative defense the doctrine of unclean hands based on Plaintiffs' alleged violations of the covenants with their own business activities.  The district court did not specifically reference the defense, but it did make a finding that equity weighed against Defendants and their abandonment claim because they had flagrantly ignored the covenants in operating their daycare business out of their home. Based on our review of the record, we find no clear error in the court's finding.

[¶28]  Before purchasing their property in the Milatzo Subdivision, Defendants Jennifer Moore and Willie Moore both signed a document entitled "Acceptance and Acknowledgement of Covenants."  Jennifer Moore testified:

> Q.    When you purchased this property with your husband, Willie Moore, you were notified of restrictive covenants that encumbered this lot; were you not?

10

A.    Yep.

Q.    All right.  If you look at Exhibit No. 3 for me, have you seen that document before?

A.    Yep.

Q.    That's an acceptance and acknowledgement of the covenants for the property at []; correct?

A.    Uh-huh.

Q.    And that's your signature?

A.    Yep.

Q.    And it's dated July 18th, 2012?

A.    Yes, sir.

Q.    Is that the date you were provided these covenants?

A.    Yes, sir.

Q.    Did you have a chance to study those covenants?

A.    I did.

* * *

Q.    And you had a chance to review these covenants before you closed on the purchase of the home?

A.    Yep.  I reviewed them and I checked them out.

Q.    And did you have any objections to these covenants, anything that you didn't like in them?

A.    * * * We saw Milatzo Avenue.  We checked the area, and after we checked the area, we were given the covenants. We looked at the covenants, and explained to [the realtor] that I saw some issues on the covenants, which there was tons of

11

violations on the covenants that we went through. A lot of the residents were violating mostly every covenant.

> Q. What objections did you have to the covenants?

> A. My objection was there was tons of businesses already running in the Milatzo Avenue.

[¶29] Jennifer Moore testified that she found the covenant violations by checking business addresses on the Secretary of State's website, by driving through the subdivision, and by seeking advice from her realtor and from "the State, the county and the city," but she did not contact residents in the subdivision and she did not consult an attorney. She further testified:

> Q. Did you contact any in Milatzo subdivision regarding the covenants?

> A. No. I couldn't.

> Q. Why not?

> A. The only person that I could contact was the developer, which was Mr. Milatzo.

> Q. Okay. Were you told to contact anybody else in Milatzo subdivision?

> A. Bill Porter.

> Q. And did you contact him?

> A. Yes.

> Q. What did you find out regarding the Building and Covenant Committee that is referred to in the covenants?

> A. I was told that the covenant was made, but it was not enforced. There was no committee.

[¶30] Other than Jennifer Moore's testimony above regarding information she received about the Building and Covenant Committee, Defendants presented no evidence showing what advice Defendants received concerning the covenants. What the district court had before it then was the acknowledgement and acceptance of the covenants, which was

12

signed by both Jennifer and Willie Moore approximately two months before they proceeded to open a daycare business in violation of those covenants based on their unilateral determination, without consulting an attorney or their neighbors in the subdivision, that the covenants had been abandoned.  In light of the record, we find no clear error in the court's determination that Defendants flagrantly ignored the covenants when they opened their daycare operation.

## CONCLUSION

[¶31]  We find no clear error in the district court's findings that the protective covenants governing the Milatzo Subdivision were not abandoned and that Defendants flagrantly ignored those covenants when they began operating a daycare business out of their residence in violation of the covenants.  Affirmed.