# IN THE SUPREME COURT, STATE OF WYOMING

## 2015 WY 131

**APRIL TERM, A.D. 2015**

**September 25, 2015**

ZYGMUNT JOHN SAMIEC,

Appellant
(Plaintiff),

v.

S-15-0028

SUSAN KAY HOPKINS,
f/k/a SUSAN KAY SAMIEC,

Appellee
(Defendant).

*Appeal from the District Court of Sweetwater County*
*The Honorable Nena James, Judge*

*Representing Appellant:*
> Jon Aimone of Lemich Law Center, Rock Springs, WY.

*Representing Appellee:*
> Eric F. Phillips of Eric F. Phillips Law Office, Rock Springs, WY.

*Before BURKE, C.J., and HILL, \*KITE, DAVIS, and FOX, JJ.*

\* Justice Kite retired from judicial office effective August 3, 2015, and pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (LexisNexis 2015) she was reassigned to act on this matter on August 4, 2015.

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**HILL,** Justice.

[¶1]    In this post-divorce dispute, Zygmunt Samiec (Father) appeals a district court order requiring him to pay 75% of his daughter's residential treatment costs.  Father contends that the district court erred in failing to recognize either a written or an implied agreement between Father and his former wife, Susan Hopkins f/k/a Samiec (Mother), to split the residential treatment costs equally.  Alternatively, Father argues that the district court should have applied the doctrine of promissory estoppel to find a binding agreement between Mother and Father to share equally in the costs of their daughter's residential treatment.  We affirm.

## ISSUES

[¶2]    Father states the issues on appeal as:

> a.      Did the Parties have a binding agreement to each pay 50% of New Haven's costs?
> b.      Does the doctrine of promissory estoppel create a binding agreement between the parties?

## FACTS

[¶3]    Father and Mother were divorced in December 2009.  The parties' decree of divorce incorporated a stipulated agreement specifying that Mother would have primary custody of the parties' two daughters and Father would have visitation.  The stipulated agreement further provided:

> 7. ... [Father] and [Mother] further agree [to] equally share the current outstanding and future costs and fees for the minor children's extracurricular activities, school activities and counseling costs. * * *
> * * * *
> 10. * * * [Father] currently carries medical insurance for the minor children. All costs of medical, dental optometric [sic], or orthodontic care not covered by such insurance for the children shall be split between the parties with [Father] paying 75% and [Mother] paying 25% of such uncovered costs.

[¶4]    In 2010, one of the parties' daughters (Daughter) was placed at the Wyoming Behavioral Institute (WBI) after threatening suicide.  Soon thereafter, Father filed a petition to modify the divorce decree, seeking custody of the parties' two children.  The parties resolved their custody dispute, but they were unable to agree on how to divide the

costs of Daughter's stay at WBI, and they asked the district court to determine whether residential treatment should be treated as a counseling cost, which pursuant to the divorce agreement would be subject to a 50/50 split between Father and Mother, or as a medical expense, which pursuant to the divorce agreement would require Father to pay 75% of any uncovered expense.

[¶5]     When Daughter completed her six-week stay at WBI in 2010, the question of how residential treatment costs should be treated under the divorce agreement was still pending before the district court. After leaving WBI, Daughter continued to experience difficulties, and Mother and Father eventually agreed to place Daughter in another residential program, the New Haven Residential Treatment Center in Saratoga Springs, Utah. Daughter's stay at New Haven began on April 12, 2011, which was again while the question of how residential treatment costs should be categorized under the divorce agreement was still pending before the district court. Daughter ultimately remained at New Haven until the end of August 2012, and the total cost of her approximately sixteen-month stay at New Haven was $212,449.00.

[¶6]     On April 4, 2012, roughly a year into Daughter's sixteen-month stay at New Haven, the district court ruled that residential treatment is a medical expense subject to the 75/25 cost sharing provision. Father appealed that ruling, and on August 28, 2013, this Court issued its decision affirming the district court's decision. *See Samiec v. Fermelia*, 2013 WY 101, ¶ 1, 308 P.3d 844, 845 (Wyo. 2013). The question of whether residential treatment should be considered a counseling cost or a medical expense was therefore unanswered before Daughter's admission to New Haven and remained a pending question throughout her entire sixteen-month stay.

[¶7]     When Daughter was admitted to New Haven, Mother and Father signed enrollment and tuition agreements with New Haven, which specified that Mother and Father were both jointly and severally liable for the fee obligations under the agreements. Pursuant to those agreements, Mother and Father were each billed 50% of Daughter's tuition on a monthly basis. This meant that by the end of Daughter's stay, Mother and Father had each paid $106,224.50 of Daughter's tuition fees.

[¶8]     On January 31, 2014, Mother filed a motion seeking an order to show cause why Father should not be held in contempt for failing to reimburse Mother $53,112.25 for half of the costs she paid to New Haven. Mother contended that based on the district court's ruling that residential treatment costs were medical expenses governed by paragraph 10 of the parties' divorce agreement, which ruling was affirmed by this Court, Father was required to pay 75% of the New Haven costs. Mother argued she was therefore entitled to reimbursement of the amounts she had paid in excess of her obligation under the divorce agreement's 75/25 split for uncovered medical expenses.

2

[¶9] On February 5, 2014, the district court issued an Order to Show Cause and directed Father to appear on March 25, 2014. Father filed a motion to vacate the show cause order, arguing that questions of fact concerning whether the parties had an enforceable agreement to each pay 50% of the New Haven costs required an evidentiary hearing and precluded the dispute from being resolved as a contempt matter. The district court then issued an Order Vacating Show Cause Hearing and Ordering Evidentiary Hearing.

[¶10] On July 1, 2014, the district court held an evidentiary hearing on the question of whether the parties had an enforceable agreement to share the New Haven costs equally rather than according to the 75/25 split provided by the parties' divorce agreement. The court found no such agreement, concluding first:

> Although the parties had binding contracts with New Haven which made them each individually responsible for 50% of the total costs, this did not create a binding agreement between them to modify the terms of the Stipulation and Agreement governing ultimate responsibility for sharing of medical costs.

[¶11] The district court then rejected Father's claims of an implied-in-fact contract to modify the parties' divorce agreement. In particular, the court rejected the contention that Mother's payment of all amounts billed to her by New Haven evidenced consent to cost sharing at the rate billed, finding that such payment was consistent with the parties' past practice of Mother paying medical bills in their entirety and then receiving reimbursement from Father. The court likewise rejected Father's promissory estoppel claim, finding there was no clear and definite agreement to modify the parties' divorce agreement, but even if there were, the evidence did not support reasonable reliance by Father.

[¶12] On October 24, 2014, the district court issued its order implementing its decision. The order directed Father to reimburse Mother $53,112.25, the amount she paid New Haven in excess of the 75/25 split dictated by the parties' divorce agreement. Father timely filed a notice of appeal to this Court.

## STANDARD OF REVIEW

[¶13] The district court's ruling resulted from an evidentiary hearing before the court, and we therefore review the court's findings of fact for clear error and its conclusions of law de novo. *Moore v. Wolititch*, 2015 WY 11, ¶ 9, 341 P.3d 421, 423 (Wyo. 2015) (quoting *Clark v. Ryan Park Prop. & Homeowners Ass'n*, 2014 WY 169, ¶ 6, 340 P.3d 288, 289 (Wyo. 2014)). We have explained:

The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*Moore*, ¶ 9, 341 P.3d at 423 (quoting *Miner v. Jesse & Grace, LLC*, 2014 WY 17, ¶ 17, 317 P.3d 1124, 1131 (Wyo. 2014)).

[¶14] In reviewing the district court's findings for clear error, "we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it." *Moore*, ¶ 10, 341 P.3d at 423 (quoting *Miner*, ¶ 17, 317 P.3d at 1131).

## DISCUSSION

[¶15] Father contends that the parties agreed to modify the cost allocation provisions of their divorce agreement both in writing and orally. Alternatively, he argues that the doctrine of promissory estoppel applies to create a binding agreement on the sharing of the New Haven costs.

[¶16] We will consider each of Father's arguments, but before turning to that discussion, we first address Mother's opening argument that whether the parties had an enforceable agreement or not is irrelevant. In particular, Mother asks this Court to ignore any alleged agreement to modify the divorce decree because it is well settled that a divorce decree may not be modified by agreement of the parties without court approval. Thus, even if the parties reached the agreement alleged by Father, that agreement was not approved by the district court and was therefore of no effect. While Mother's recitation of the law governing modification of a divorce decree is generally sound, we disagree that it renders the parties' disputed agreement irrelevant.

[¶17] We have recognized the "established principle that the parties to a divorce may not modify a divorce decree without submitting those modifications to the district court for its consideration and approval." *Richardson v. Richardson*, 868 P.2d 259, 262 (Wyo. 1994) (citing *McKenzie v. Shepard*, 814 P.2d 701, 702 (Wyo. 1991)). The manner in which a decree is modified is by petition to the court by either party to the decree. *See* Wyo. Stat. Ann. § 20-2-116 (LexisNexis 2015) (district court authority to modify

4

decree's allowance for a party or children on petition of either party). The decision whether to grant such a petition for modification is committed to the district court's discretion. *Schluck v. Schluck*, 2008 WY 92, ¶ 2, 189 P.3d 877, 878 n. 2 (Wyo. 2008); *Maher v. Maher*, 2004 WY 62, ¶ 6, 90 P.3d 739, 741 (Wyo. 2004).

[¶18] In this case, Father asserted that the parties had an agreement to modify the divorce agreement provisions governing responsibility for residential treatment costs. Presumably, if the district court had found such an agreement, the court then would have been required to decide whether to approve the agreed-upon modification, a decision that, as noted above, would have been committed to the district court's discretion. Here, the district court found no agreement to modify, and it therefore never reached the question of whether it would approve such a modification. The required court approval for any modification is thus simply not at issue in this appeal.

[¶19] We turn then to our review of the district court's rulings on Father's modification and promissory estoppel claims.

## A.    Modification of the Divorce Agreement

[¶20] Paragraph 14(f) of the parties' divorce agreement provides that "[n]o modification or waiver of any of the terms hereof shall be valid unless in writing and signed by both of the parties." Father argues that the parties had a written agreement to modify their divorce agreement in the form of the agreement they signed with New Haven. In the alternative, Father argues that the parties had an enforceable implied-in-fact agreement. We find no clear error in the district court's rejection of both claims.

## 1.    Written Agreement

[¶21] The record contains two New Haven agreements, the "New Haven Enrollment Agreement," and the "New Haven Tuition Financial Agreement." Both documents bear the signatures of Mother and Father, who are identified as "Sponsors" under the agreements. The New Haven Enrollment Agreement identifies the parties to the agreement as the New Haven and the Sponsor, and it outlines the services New Haven will provide as well as the other obligations of the parties. In regard to payment of fees, the Enrollment Agreement contains the following provisions:

> 3.    **Student Tuition, Program Fees and Enrollment Fees.** In consideration for the services provided by New Haven under this Agreement, the Sponsor agrees that they have read, understand, have completed, and have signed the Tuition Financial Agreement which is made part of this Agreement as Exhibit A, and that they agree to make timely payments to New Haven of all program fees and enrollment

5

fees outlined in the Tuition Financial Agreement. Except as otherwise provided in this Agreement (or any Exhibit to this Agreement), Sponsor is financially obligated to pay all enrollment and program fees for the entire treatment period. Sponsor's total program fee obligations under this Agreement will be billed to Sponsor in monthly installments. New Haven charges the full daily tuition rate for both the Admittance Date and Discharge Date. The program and enrollment fees cover only the services provided by New Haven as described in Paragraph 2. New Haven will not release the official transcripts of the Student's academic credits until all amounts due New Haven under this Agreement have been paid in full.

\* \* \* \*

5. **Insurance Coverage and Arrangements with Third Parties.** This Agreement is between New Haven and Sponsor, and Sponsor is personally responsible for all program fees, enrollment fees, and Student costs incurred during the Student's enrollment at New Haven. \* \* \*

\* \* \* \*

19. **Miscellaneous.** \* \* \* All obligations of the Sponsor under this Agreement are joint and several, as the case may be.

[¶22] The New Haven Tuition Financial Agreement outlines the daily and other fees for Daughter's enrollment. The Financial Agreement's opening paragraph provides that "Sponsor agrees to pay New Haven under the terms of this Tuition Financial Agreement." The Agreement also provides in its paragraph 19 that "All obligations of the Sponsor hereunder shall be joint and several, as the case may be."

[¶23] The New Haven Enrollment Agreement and New Haven Financial Tuition Agreement are the only signed agreements addressing responsibility for payment of the costs for Daughter's placement at New Haven. By their plain terms, the New Haven agreements speak only to the obligations between New Haven, on one side, and Mother and Father, on the other side. The agreements do not reference the divorce agreement between Mother and Father and do not in any manner purport to address any obligations between Mother and Father. The New Haven agreements thus cannot be read to be a written modification of the parties' divorce agreement, and we find no error in the district court's rejection of Father's written modification claim.

## 2. Implied-in-Fact Contract

[¶24]  As noted above, the parties' divorce agreement specified that any modification of the agreement's terms was not valid unless it was done in writing and signed by both parties.  This Court has long recognized, however, that even a contract with an integration clause, such as the one in the parties' divorce agreement, may be modified through oral agreement or by mutual conduct of the parties if certain conditions are met.  *See Big-D Signature Corp. v. Sterrett Props., LLC*, 2012 WY 138, ¶ 33, 288 P.3d 72, 80 (citing *Quin Blair Enters. v. Julien Constr. Co.*, 597 P.2d 945, 951 n. 6 (Wyo. 1979)) (Wyoming follows general rule that unless a contract is required by law to be in writing, the contract may be orally modified).  The conditions that must be met to orally modify an integrated agreement are: "First, there must be evidence that the parties orally modified the contract terms, and second, the parties have taken actions consistent with the new terms."  *Big-D, ¶ 33, 288 P.3d at 81.*

[¶25]  Father argues that the parties modified their divorce agreement through an implied-in-fact contract.  An implied-in-fact contract is one that "may be found to exist as a matter of fact and is dependent upon the parties' intent."  *Birt v. Wells Fargo Home Mortg., Inc.*, 2003 WY 102, ¶ 15, 75 P.3d 640, 649 (Wyo. 2003) (citing *Shaw v. Smith*, 964 P.2d 428, 435–36 (Wyo. 1998)).  It exists where the parties' conduct supports a "conclusion that the parties expressed a mutual manifestation of an intent to enter into an agreement."  *Id*. (quoting *Shaw*, 964 P.2d at 435–36).  This Court recently described the process for determining the existence of an implied-in-fact contract:

> [W]e look not to the subjective intent of the parties, but to "'the outward manifestations of a party's assent sufficient to create reasonable reliance by the other party.'" *Givens v. Fowler*, 984 P.2d 1092, 1095 (Wyo.1999) (quoting *McDonald v. Mobil Coal Producing, Inc.*, 820 P.2d 986, 990 (Wyo.1991)). The question is "whether a reasonable man in the position of the offeree would have believed that the other party intended to make an offer." *Boone* [*v. Frontier Ref.*, 987 P.2d 681 at 687 (Wyo.1999)]. In 1991, we adopted Restatement (Second) of Contracts § 19 (1979) for guidance in determining whether an implied-in-fact contract exists:
>
> > "(1) The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act.
> >
> > (2) The conduct of a party is not effective as a manifestation of his assent unless he intends to engage

7

in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents.

(3) The conduct of a party may manifest assent even though he does not in fact assent. In such cases a resulting contract may be voidable because of fraud, duress, mistake, or other invalidating cause."

*McDonald*, 820 P.2d at 990. In essence, an implied-in-fact contract may arise where "parties act in a manner conveying mutual agreement and an intent to promise...." *Worley v. Wyoming Bottling Co., Inc.*, 1 P.3d 615, 620 (Wyo.2000).

*Symons v. Heaton*, 2014 WY 4, ¶ 9, 316 P.3d 1171, 1174-75 (Wyo. 2014) (quoting *Birt*, ¶ 16, 75 P.3d at 649).

[¶26] Although an implied-in-fact contract may be found based solely on the parties' conduct, Father alleges both an oral modification of the divorce agreement and conduct consistent with that modification. Thus, he asserts an implied-in-fact contract that, if found, would comply with the *Big-D* requirements for modifying a contract with an integration clause. Specifically, Father asserts (record citations omitted):

> Mother offered Father to have their [Daughter] enroll in voluntary, residential treatment at New Haven. Father accepted the offer. In order to induce Father into accepting the offer, Mother represented that she would pay 50% of the New Haven costs. Mother knew that Father believed she would pay 50% of the New Haven costs. Mother paid 50% of the New Haven costs.

[¶27] We find Father's argument unsupported by the testimony in this case. This is particularly so in light of our standard of review, which requires that we accept the evidence of the prevailing party as true and give that party every reasonable inference that can fairly and reasonably be drawn from it. *See Moore*, ¶ 10, 341 P.3d at 423. Viewed in this light, the testimony reveals that Mother and Father both believed that Daughter needed residential treatment and that Mother accepted the 50% billing for the New Haven costs while the question of which divorce agreement cost-sharing provision applied to those costs remained a pending question. The testimony does not support the inducement scenario asserted by Father.

[¶28] Mother testified that after Daughter left WBI, Daughter continued to experience difficulties, including anxiety and depression, and Daughter again attempted suicide. Mother further testified:

> Q. Prior to going to this intake meeting had you had any conversations with [Father] about what you were doing?
>
> A. Yes.
>
> Q. What was the general nature of those conversations?
>
> A. When [Daughter] told me that she thought she needed help, I did get hold of him and said I think this is something we need to do. I'm going to go out and see what I can find out there. If you have any suggestions, anything you would like me to try to figure out along with it, if there is any place that you found that you think would be good, let me know. And conveyed to him what I found out. And essentially we got to New Haven because, I mean, it was recommended highly on the internet and by another facility.
>
> Q. Did he indicate he was onboard with New Haven?
>
> A. Yes.
>
> Q. Did you discuss at all the cost associated with New Haven proper to that – well, tell me first, when exactly did this intake meeting take place?
>
> A. April 12, 2011.
>
> Q. April 12, 2011. So prior to that date did you guys discuss the cost associated with putting her into this program?
>
> A. Yeah. We knew it was going to be really expensive.
>
> Q. Did you discuss at all who was going to pay for what cost?
>
> A. No.
>
> Q. Was there general discussions, you pay half, I pay half, anything like that at all?
>
> A. No. I think that it was assumed by [Father] that that's what would happen, but at that point my daughter needed to be in a treatment facility and –
>
> Q. I don't mean to interrupt you. "It was assumed by [Father]," what would make you think he was assuming?
>
> A. Because he never raised anything about how it would be split up. Just that as we went and we were

presented the paperwork, which was 50/50, that was just going to be the way it would be.

Q.     Okay. So when you say you were presented the paperwork, this was something that happened at that April intake meeting?

A.     Yes.

Q.     Who presented you with this paperwork?

A.     New Haven.

Q.     So the staff there?

A.     Yes.

Q.     And they just – I mean, was there discussion – let me be careful of my questions here.

A.     Okay.

Q.     Did they ask, or anybody else, how do you guys want this divided up, 25/70, 50/50, he is paying all of it, you are paying none of it, anything like that at all?

A.     Not to my knowledge, no. Essentially that's how – in a divorce situation most cases are just presented that way and so that's the way they drew up the paper work.

Q.     So the paperwork that was handed to you, at least in some sort of documentation, it was clear from that meeting that you were going to be billed 50 percent, he was going to be billed 50 percent?

A.     Correct.

Q.     At that time did you have any idea whether or not you were going to get any of that reimbursed or was that even a consideration?

A.     At that point, no, I did not. We were waiting, we knew that the question of whether her psychiatric care was deemed medical or counseling, that was on the table at that point and it was not yet – there was not a decision made yet. So with the intent that we would see how the decision came up, I would pursue the New Haven cost.

Q.     So at least at that point you were going to go with what they presented, each of you paying half?

A.     Yes.

Q.     And see kind of where the cards lie or fall when you go into court and deal with it that way?

A.     That is correct. Because I knew if I didn't at least go along with what was perceived, that [Daughter] – [Father] would not have agreed for [Daughter] to have treatment.

10

[¶29]  Father testified:

> Q.    When [Daughter] was brought to New Haven, what discussions did you have with [Mother] prior to placement regarding the need for treatment?
>
> A.    Of course I – I being in Rock Springs and [Mother] living with [Daughter], I wasn't, call it privy, to all that was going on * * * . But I could tell that [Daughter] needed – needed some additional help and so I decided that that was probably a good idea to have her go to residential treatment also.
>
> Q.    Did you have a discussion with [Mother] regarding those costs?
>
> A.    Yeah.  We – because we had to find what the costs were and then we had to see if insurance was going to cover it, so we did have the discussion about how much – basically how much it cost.
>
> Q.    And you discovered in that process that your insurance which was the primary insurance for the children's health care was not going to cover residential treatment?
>
> A.    That's correct.
>
> Q.    And you informed [Mother] of that?
>
> A.    I did.
>
> Q.    Did you then discuss the cost sharing for New Haven?
>
> A.    No, because I think we already knew that we were going to split the costs 50/50.  We have been splitting counseling costs 50/50 the entire time.
>
> Q.    So there was –
>
> A.    So it's pretty straightforward that we would split it 50/50 from then on.
>
> Q.    So you considered this expenditure to be a counseling cost?
>
> A.    Yes, because –
>
> Q.    And both of you treated it accordingly?
>
> A.    Mostly in the residential treatment program she was getting schooling, she was getting physical activity, and there is very little of it that's actually –well, almost none of it was actually by a doctor.  The psychiatrist saw her once a month at the most, it was more like once every three months.  So as part of our divorce decree, and that's why it was split 50/50, was that we had been splitting those costs 50/50 even before we got completely divorced.

11

> Q. Did [Mother] ever provide you any written objection to paying that 50 percent fee?
>
> A. No.
>
> Q. Did she ever serve you court papers while [Daughter] was at New Haven objecting to paying the 50 percent fee?
>
> A. No.
>
> Q. And she paid that 50 percent voluntarily during all of that period?
>
> A. Correct.
>
> Q. It was paid on a monthly basis by both of you?
>
> A. Yes.
>
> * * *
>
> Q. And no one told New Haven to make any other split or adjustment during that time period?
>
> A. No. They were told the very first day that the costs were split 50/50.
>
> Q. When they were told the costs were split 50/50, who made that statement?
>
> A. I'm pretty sure I'm the one that said we are splitting these costs 50/50.
>
> Q. Was [Mother] there at the time?
>
> A. Right. * * *

[¶30] On cross-examination, Father further testified:

> Q. Just to make sure we are clear, you are not disagreeing with the fact that there were no discussions between you and [Mother] prior to going to New Haven as to who was going to pay what? You assumed it was 50 percent, but that was never actually discussed; is that correct?
>
> A. I don't know that we ever actually discussed it, no. But she would have known since insurance wasn't paying it and they were going to split it 50/50 or it was assumed that way.

[¶31] Father's wife, Patricia Samiec, was also present at the April 12, 2011 New Haven intake meeting. She testified:

> Q. What do you recall of that discussion?
>
> A. They brought in the paperwork to be signed and only [Father] and [Mother] signed the paperwork, but they

12

came in and asked how it was to be billed out and they responded 50/50.

Q. I'm sorry. Who responded 50/50?
A. Both [Father] and [Mother].
Q. So both individuals expressed their understanding that bills for the residential treatment were to be paid 50% by each party?
A. Correct.

\* \* \*

Q. Was any objection made to that 50/50 split?
A. No.
Q. Was there any further discussion about it?
A. No.

[¶32] The testimony of the parties, as well as that of Patricia Samiec, indicates that the sole discussion of how the New Haven costs would be shared between Mother and Father took place in the April 12, 2011 intake meeting at New Haven. That discussion was one that concerned how New Haven would bill the parties. It was not a discussion between Mother and Father during which they orally agreed to modify the terms of their divorce agreement or even discussed the terms of their divorce agreement.

[¶33] Additionally, while Mother's testimony reflects her subjective belief that Father would have balked at the New Haven placement if Mother had not accepted the 50% billing, it is clear even from Father's testimony that no promises were made to induce his agreement to Daughter's enrollment in the New Haven program. The decision to enroll Daughter was made before the intake meeting, and while the parties discussed how much the treatment would cost before that meeting, they did not discuss how those costs would be shared.

[¶34] In addition to the fact that the parties did not discuss modification of their divorce agreement, it is important to consider the timing of the New Haven intake meeting. The intake meeting took place nearly a year before the district court ruled on the parties' request for a determination of whether residential treatment was considered a counseling cost, subject to the 50/50 cost sharing, or a medical expense, subject to the 75/25 cost sharing. Given that the parties did not yet know how the district court would rule on how residential treatment costs were to be shared under the divorce agreement, and given that the parties had not withdrawn their request for that interpretation, it would seem premature for the parties at that point to be agreeing to modify the divorce agreement.

[¶35] The bottom line is that nothing in the parties' testimony or circumstances reflects a mutual assent to modify the parties' divorce agreement. Father himself did not testify to an agreement outside the divorce agreement and instead testified that he viewed the New Haven costs as counseling costs subject to the divorce agreement's 50/50 cost sharing.

13

Mother, conversely, testified that she understood that the district court had not yet ruled on how residential treatment costs should be treated and was willing to accept the 50% billing pending the court's decision. While the question of mutual assent is an objective one, not based on the parties' subjective intentions, the views reflected in the parties' testimony, coupled with the lack of any discussion between Mother and Father as to cost sharing, makes its objectively unreasonable to find an implied-in-fact agreement to modify the divorce agreement.

[¶36] Nor do we find objective evidence of a modification in Mother's payment of the New Haven costs as billed. Both Mother and Father testified that Mother had in the past paid bills in their entirety for expenses of the parties' daughters and then sought and received reimbursement from Father. The payments themselves were therefore not necessarily evidence of an agreement to modify the divorce agreement.

[¶37] Based on the foregoing, we find no clear error in the district court's rejection of Father's claim of an implied-in-fact modification of the parties' divorce agreement. We turn then to Father's alternative argument that pursuant to the doctrine of promissory estoppel, the parties had a binding agreement to share equally in the costs of their daughter's enrollment at New Haven.

## B.    Promissory Estoppel

[¶38] "Parties to a written contract may agree to change that contract. In the proper circumstances, the change may be enforced through promissory estoppel." *Baker v. Ayres & Baker Pole & Post, Inc.*, 2007 WY 185, ¶ 13, 170 P.3d 1247, 1251 (Wyo. 2007) (citing *Verschoor v. Mountain W. Farm Bureau Mut. Ins. Co.*, 907 P.2d 1293, 1298 (Wyo. 1995)). The elements that must be present to enforce such an agreement through promissory estoppel are:

> (1) the existence of a clear and definite promise which the promisor should reasonably expect to induce action by the promisee; (2) proof that the promisee acted to its detriment in reasonable reliance on the promise; and (3) a finding that injustice can be avoided only if the court enforces the promise.

*Symons*, ¶ 13, 316 P.3d at 1176 (quoting *Redland v. Redland*, 2012 WY 148, ¶ 91, 288 P.3d 1173, 1194 (Wyo. 2012)).

[¶39] The district court found that Father failed to prove either a clear and definite promise or reasonable reliance on the alleged promise. Father challenges these findings as clearly erroneous. He argues that Mother's signing of the New Haven Enrollment Agreement was a clear and definite promise to pay 50% of the costs and Father

reasonably relied on that promise because Mother in fact made the required payments pursuant to her 50% agreement. These arguments fail for the same reasons we discussed above.

[¶40] First, Mother's signing of the New Haven agreement was a promise to New Haven, not to Father. As we discussed above, the written agreement defined the parties' obligations to New Haven and New Haven's obligations to the parties. The agreement contained no promises between Mother and Father. Moreover, Father's testimony confirmed that Mother had made no other promises concerning the sharing of the New Haven costs:

> Q. Just to make sure we are clear, you are not disagreeing with the fact that there were no discussions between you and [Mother] prior to going to New Haven as to who was going to pay what? You assumed it was 50 percent, but that was never actually discussed; is that correct?
> A. I don't know that we ever actually discussed it, no. But she would have known since insurance wasn't paying it and they were going to split it 50/50 or it was assumed that way.

[¶41] Father's testimony shows that he acted upon an assumption, not a clear and definite promise. Moreover, given that the parties had a pending request before the district court to have that court rule on whether residential treatment should be treated as a counseling cost or a medical expense under the divorce agreement and that the parties had not withdrawn that request, Father's reliance on this assumption is less than reasonable. As for Mother's payment of the New Haven costs as they were billed to her, Mother had, again as we also discussed above, made past payments in full and then requested and received reimbursement from Father. It was therefore not reasonable for Father to rely on Mother's payment of the New Haven billings as her assent to the 50% cost sharing.

[¶42] For these reasons, we find no clear error in the district court's rejection of Father's promissory estoppel claim.

## CONCLUSION

[¶43] We find no clear error in the district court's rejection of Father's contract and promissory estoppel claims. Affirmed.