2003 WY 85

Joseph R. HAMMONS and Darlene S. Hammons, Appellants (Plaintiffs),

v.

TABLE MOUNTAIN RANCHES OWN-ERS ASSOCIATION, INC., a Wyoming Corporation, Appellee (Defendant).

No. 01–151.

Supreme Court of Wyoming.

July 15, 2003.

Alexander K. Davison and Wendy J. Curtis of Patton & Davison, Cheyenne, Wyoming, Representing Appellants. Argument by Mr. Davison.

Julie Nye Tiedeken of Tiedeken Law Offices, Cheyenne, Wyoming, Representing Appellee.

Before HILL, C.J., and LEHMAN *, KITE, and VOIGT, JJ., and KAUTZ, D.J.

* Chief Justice at time of oral argument.

KAUTZ, District Judge.

[¶ 1] This case considers whether an "Architectural Control Committee" properly denied Appellants', Joseph R. Hammons and Darlene S. Hammons (the Hammons), application to place a modular home in Table Mountain Ranches, a subdivision in Laramie County. The district court determined that covenants, which specifically excluded modulars in Table Mountain Ranches, were invalidly adopted. However, it found that prior covenants, still in effect, authorized rejection of the Hammons' plans on "aesthetic" grounds. The district court also found that the Architectural Control Committee acted reasonably in denying the plans.

[¶ 2] We conclude that the district court properly applied the law and that sufficient evidence supports its findings and conclusions. We affirm the trial court's declaratory judgment.

## ISSUES

[¶ 3] The Hammons list these issues:

1. Did the District Court properly apply Wyoming Law of Aesthetic Covenants when determining that the decision of the Board of Table Mountain Ranches was reasonable?

2. Is the District Court's reliance upon the testimony of the architectural control committee clearly erroneous considering its order invalidating the 1998 covenants?

The Appellee, Table Mountain Ranches Owners Association, Inc. (TMROA) rephrases the issues as follows:

*Issue 1* Did the Trial Court properly hold that the original purpose of the covenants can still be accomplished and thus the covenants have not been abandoned?

*Issue 2* Did the Trial Court properly hold that the actions of the Architectural Control Committee in disapproving the Hammons' proposed home was reasonable and made in good faith?

*Issue 3* a) Since the membership of the Architectural Control Committee was not raised in front of the Trial Court, should it be considered by the Supreme Court on appeal?

b) Did the Trial Court properly hold that the decision of the Architectural Control Committee would have been the same under the 1973 version of the covenants and should stand even though the 1998 covenants were found to be invalid?

## FACTS

[¶ 4] Table Mountain Ranches is a subdivision in Laramie County. In 1973 its developers filed a declaration of protective covenants. They made minor adjustments to those covenants in 1974 and 1977. (The 1973 covenants with the 1974 and 1977 amendments are referred to herein as the 1977 covenants). The 1977 covenants created an Architectural Control Committee (A.C.C.), whose declared purpose was

[t]o assure, through intelligent architectural control of building design, placement and construction, that Table Mountain Ranches shall become and remain an attractive community, and to uphold and enhance property values.

The A.C.C. consisted of three members. The subdivider appointed one member, and owners of complete dwellings in the subdivision selected the other two. After 90% of the tracts in the subdivision were sold, the "homeowners group" selected all three A.C.C. members. Initially, a three-member A.C.C. functioned. At some point, however, the Homeowner's Association Board assumed the role of the A.C.C.

[¶ 5] The covenants required that lot owners submit their plans and obtain written approval from the A.C.C. before they build. The A.C.C. had broad latitude in deciding what plans to approve or disapprove under the 1977 covenants. Those covenants stated, "[d]isapproval of plans and specifications may be based on any grounds including purely aesthetic grounds."

[¶ 6] Initially, the A.C.C. excluded prefabricated buildings except for "Boise Cascade Homes." The evidence established that Boise Cascades more resembled stick-built homes than prefabricated homes. Through 1993 the A.C.C. excluded modular homes. From 1994 to 1996 the A.C.C. napped rather than enforced the covenants of the subdivi-

sion and permitted prefabricated homes by failing to consider or respond to applications. After this lapse, the subdivision contained 107 undeveloped lots, 57 stick-built homes, and 11 prefabricated homes. In 1996, a more vigilant A.C.C. assumed the helm. Since then, it has consistently disapproved prefab homes with rectangular low-pitched roofs. It took legal action and forced the removal of a "double-wide" or modular prefabricated home.

[¶ 7] In 1998, the TMROA attempted to amend the covenants of the subdivision. For purposes of this case, the 1998 covenants contained two significant changes. First, they gave the TMROA board the role of the A.C.C. This change reflected the practice that had been followed for some time. Second, the 1998 covenants added this language: "No mobile, manufactured, modular or site built homes resembling basic rectangular low pitch roof double wide manufactured or modular homes will be authorized."

[¶ 8] The Hammons bought two lots in the Table Mountain subdivision in 1995. On May 3, 1999, they sought approval for a prefabricated home. The A.C.C. denied approval twice, once after some members viewed a sample home, citing aesthetic grounds. Thereafter, the Hammons filed this case. Their complaint alleged that the 1998 amendments to the covenants were invalid, and that their plans would have been approved under the 1977 covenants.

## PROCEDURAL HISTORY

[¶ 9] The Hammons sued for declaratory judgment. They sought (1) a declaration that the 1998 covenants were invalid, (2) a declaration that they were entitled to have their home plans approved, irrespective of which covenants governed, and (3) damages. The trial court invalidated the 1998 covenants, held that the 1977 covenants had not been abandoned, and held that under them, the A.C.C. acted reasonably and within their authority in denying the Hammons' plans.

[¶ 10] Inspired by the trial court's invalidation of the 1998 covenants, the Hammons asked the trial court to amend its Findings and Conclusions. They argued that because

it invalidated the 1998 covenants, the court should also have disregarded the testimony of the Board as to whether the Hammons' home would have been disapproved under the older covenants. The Hammons asserted that because the 1977 covenants provided a different A.C.C. membership than the 1998 covenants, the TMROA could not speak as the A.C.C. under the older covenants. Several TMROA board members testified that they would not approve the Hammons' plans under either set of covenants.

[¶ 11] TMROA submitted a judgment under W.R.C.P. 58, to which the Hammons filed an objection, restating the grounds from their motion to amend. The trial court considered the motions on March 1, 2001, and entered the declaratory judgment without the Hammons' proposed amendments. The Hammons then filed both a Rule 50(b) motion and a motion nominally based on Rules 59(a)(6) and (e). However, in a strange turn, they withdrew those motions and timely filed this appeal.

## STANDARD OF REVIEW

[¶ 12] The district court's decisions as to whether the covenants were abandoned, and whether the board acted reasonably, combine questions of law and fact. Questions of law are reviewed *de novo*. *Stansbury v. Heiduck*, 961 P.2d 977, 978 (Wyo.1998). A district court's findings of fact will be upheld unless the findings are clearly erroneous. *Mathis v. Wendling*, 962 P.2d 160, 163 (Wyo. 1998). A finding is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Springer v. Blue Cross and Blue Shield of Wyoming*, 944 P.2d 1173, 1176 (Wyo.1997) (citing *Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 538 (Wyo.1993)).

## ANALYSIS

### Were the Covenants Governing the Table Mountain Ranches Subdivision Abandoned?

[¶ 13] The Hammons claim that TMROA lost the right to enforce, or aban-

doned, the "aesthetic" provision in the 1977 covenants because other prefabricated homes were built in the subdivision.

[¶ 14] A protective covenant is abandoned by failure to enforce that covenant when the covenant is violated, the violations are ignored or acquiesced to, and the violations are ... so great, or so fundamental or radical as to neutralize the benefits of the restriction to the point of defeating the purpose of the covenant. In other words, the violations must be so substantial as to support a finding that the usefulness of the covenant has been destroyed, or that the covenant has become valueless and onerous to the property owners.

*Keller v. Branton,* 667 P.2d 650, 654 (Wyo. 1983) (citing *Riley v. Stoves,* 22 Ariz.App. 223, 526 P.2d 747, 68 A.L.R.3d 1229 (1974)). The trial court properly utilized the standard from *Keller* in deciding the abandonment issue.

[¶ 15] The purpose and benefit of the "aesthetic" provision in the 1977 covenants is specified in the covenants themselves. The covenants specifically state that their intent is to "protect and enhance the value, desirability and attractiveness" of the subdivision.

[¶ 16] The record contains considerable evidence indicating that the purpose of protecting and enhancing the value of property in the subdivision by excluding certain prefabricated homes remains viable. Although 11 prefabricated homes now exist there, there are 57 stick-built homes and the balance of the 217 lots are undeveloped. The evidence indicated that the manner in which those remaining lots are developed could have a significant impact on the value of the existing homes. The trial court recognized this evidence and held that the "aesthetic" covenant was not abandoned. We find that this decision is supported by evidence and not "clearly erroneous."

**Should this Court Consider Membership of the A.C.C. When that Issue Was Not Presented to the Trial Court Until After the Trial Court's Decision?**

 [¶ 17] This Court will ordinarily entertain only arguments raised in the court below. *Cooper v. Town of Pinedale,* 1 P.3d 1197, 1208 (Wyo.2000). Exceptions to this rule exist if the argument is jurisdictional, or if it is "of such a fundamental nature that it must be considered." *Id.* (citing *WW Enterprises v. City of Cheyenne,* 956 P.2d 353, 356 (Wyo.1998) and *Bredthauer v. TSP,* 864 P.2d 442, 447 (Wyo.1993)).

[¶ 18] The Hammons did not allege in their complaint that the selection of A.C.C. members under the 1977 covenants was invalid. They did not assert that if the 1998 covenants were improperly adopted, the court should order a different committee to review the Hammons' plans. The Hammons did not present this issue to the trial court, and the trial court did not consider it. They asked only for a declaration that their plans should be approved under the 1973 covenants.

[¶ 19] The issue about composition of the A.C.C. is not jurisdictional. It is not so "fundamental" that it must be considered. The Hammons did not raise this issue until after the trial court decided the case. This Court will not consider the issue now.

[¶ 20] The Hammons imply that it is logically impossible for the trial court to invalidate the 1998 covenants, but then to consider testimony from the A.C.C. formed under the 1998 covenants. That testimony indicated that the 1998 A.C.C. would not approve the Hammons' plans even under the 1977 covenants. The evidence established, however, that the composition of the A.C.C. under the 1998 covenants was the same as had been put in practice before the 1998 amendments. The Hammons did not assert that the A.C.C. membership was invalid before the 1998 amendments, and we will not consider that issue now.

 [¶ 21] After the trial court issued its decision, the Hammons attempted to raise their questions about the A.C.C. membership through motions. Then they withdrew their motions.[1] Those motions did not timely raise

---

1. The withdrawal of the Hammons' post-trial motions is not a direct issue in this case. We

note, however, that the Hammons incorrectly believed they could not appeal while a motion

an issue that should have been presented before trial. A motion to alter or amend "cannot be used to raise arguments which could, and should, have been made before judgment issued." *Beyah v. Murphy,* 825 F.Supp. 213, 214 (E.D.Wis.1993); *F.D.I.C. v. World University Inc.,* 978 F.2d 10, 16 (1st Cir.1992). Further, Appellants withdrew the motions. A motion withdrawn leaves the record as it stood prior to the filing of the motion, *i.e.,* as though it had not been made. *In re Stoute,* 91 A.D.2d 1043, 458 N.Y.S.2d 640, 641 (1983); *People v. Steinhoff,* 38 Mich. App. 135, 195 N.W.2d 780, 781 (1972); 56 Am.Jur.2d *Motions, Rules, and Orders* § 32 (2000).

### Did the Trial Court Properly Hold that the Actions of the Architectural Control Committee in Disapproving the Hammons' Proposed Home was Reasonable and Made In Good Faith?

[¶ 22] Covenants "are contractual in nature and are to be interpreted in accordance with the principles of contract law." *McHuron v. Grand Teton Lodge Company,* 899 P.2d 38, 40 (Wyo.1995) (citing *Kindler v. Anderson,* 433 P.2d 268 (Wyo.1967)). The district court invalidated the 1998 covenants because of procedural defects in the amendment process. Neither side appealed that ruling. Consequently, the prior covenants remained effective. They said:

> Authority: *No structure,* including walls and fences *shall be* erected, converted, *placed,* added to or altered *on any lot until the construction plans, specification* (to include samples of exterior materials and colors to be used) *and a plan showing the location of the structure have been approved in writing by the Architectural Control Committee.* Consideration will be given to quality of workmanship and materials, harmony of external design with existing structure, location with respect to other structures (actual and planned), topography and to finished grade elevation. *Disapproval of plans and specifications may be based on any*

*grounds including purely aesthetic grounds.* Structural color schemes will be compatible with the natural environment of the subdivision. Natural or earth colors will be required. [Emphasis added.]

[¶ 23] "Aesthetic grounds," should not be a *carte blanche* for arbitrary use of power by a homeowners' association. By that same token, courts should not be arbiters of taste. The majority approach in other states requires decisions under a consent-to-build covenant to be reasonable, *e.g., Riss v. Angel,* 131 Wash.2d 612, 934 P.2d 669, 678 (1997); *Trieweiler v. Spicher,* 254 Mont. 321, 838 P.2d 382, 385 (1992) (citing nine cases from eight states); *see also McHuron,* 899 P.2d at 43–44 (Golden, C.J., dissenting) (discussing the reasonableness approach). We adopt the requirement of reasonableness, even if the covenants do not specifically impose such a requirement.

[¶ 24] The trial court properly reviewed the A.C.C.'s denial of the Hammons' plans to determine if that decision was reasonably made. The trial court's finding of reasonableness was a finding of fact. *Trieweiler,* 838 P.2d at 385. That finding of fact will be upheld unless it is clearly erroneous. *Mathis,* 962 P.2d at 163. Such error is absent here.

[¶ 25] The district court found that, "[t]he decision of the A.C.C. was not based upon caprice, but was a good faith attempt to carry out the original intent of the developers of the subdivision." The court then went on to discuss the incompatibility between the Hammons' proposed prefabricated home and the character of the subdivision. There was evidence directly supporting the trial court's finding. A vast majority of the other homes in the subdivision were not modulars. Witnesses established that additional modulars would negatively impact the value of existing homes and would change the nature of the subdivision. The A.C.C. did not single out the Hammons for rejection, but consistently denied applications to erect modular homes.

---

was pending. The Hammons relied on *Rutledge v. Vonfeldt,* 564 P.2d 350 (Wyo.1977) for this belief. We decided *Rutledge* before adopting the Wyoming Rules of Appellate Procedure. WRAP 2.04 solves the Hammons' concerns under *Rutledge* by preserving the effect of a premature notice of appeal.

This Court will not substitute its judgment on the value of this evidence for that of the A.C.C. or the trial court. The trial court's finding of reasonableness was not clearly erroneous. We affirm the trial court's finding that the A.C.C. acted reasonably.

[¶ 26] The Hammons argue that the district court improperly employed a test that balanced their interests against TMROA's interests when it determined reasonableness. Although the district court's decision letter stated that "their (Hammons') plight ... must be ... *weighed* against the aspirations of the homeowners ..." and found in favor of TMROA "after *weighing* the factors," it did not employ a balancing of interests test. The "weighing" language does not demonstrate a balancing test, but only shows the trial court's serious consideration of the positions taken by each side. The district court's decision letter properly addresses the legal standard for enforceability of an aesthetic covenant. It discusses evidence that supports reasonableness in the A.C.C.'s decision.

## CONCLUSION

[¶ 27] Sufficient evidence supports the trial court's findings that the aesthetic covenant was not abandoned, and that the A.C.C. of TMROA acted reasonably when it denied the Hammons' application to install a modular home. The Hammons did not claim that the A.C.C. membership was improper in the trial court, and this Court will not consider that new issue now. The judgment of the district court is affirmed.