# IN THE SUPREME COURT, STATE OF WYOMING

## 2016 WY 67

APRIL TERM, A.D. 2016

June 30, 2016

FELIX FELICIS, LLC, a Wyoming
limited liability company, and CAROL
BAKER and MARK STEIN,

Appellants
(Plaintiffs),

v.

S-15-0236

RIVA RIDGE OWNERS
ASSOCIATION, CODY MUELLER,
JOHN CAMPBELL, and JEFF HUSSEY,

Appellees
(Defendants).

*Appeal from the District Court of Teton County*
The Honorable Timothy C. Day, Judge

*Representing Appellants:*
James K. Lubing and Laurie J. Stern of Lubing Law Group, LLC, Jackson, Wyoming. Argument by Mr. Lubing.

*Representing Appellee Riva Ridge Owners' Association:*
Kim D. Cannon of Davis & Cannon, LLP, Sheridan, Wyoming; Leah C. Schwartz of Davis & Cannon, LLP, Cheyenne, Wyoming. Argument by Mr. Cannon.

*Representing Appellees Cody Mueller, John Campbell, John Jackson and Jeff Hussey:*
J. Denny Moffett of Moffett & Associates, P.C., Jackson, Wyoming.

*Before BURKE, C.J., and HILL, DAVIS, and KAUTZ, JJ., and FORGEY, D.J.*

*KAUTZ, J., delivers the opinion of the Court; FORGEY, D.J., delivers an opinion concurring in part and dissenting in part.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KAUTZ, Justice.**

[¶1]  The Appellants, Felix Felicis, LLC, Carol Baker and Mark Stein (hereinafter the Baker-Steins), filed a Complaint against the Appellees, Riva Ridge Owners Association and the members of the Association's Board of Directors and Site Committee, Cody Mueller, John Campbell, and Jeff Hussey, after the Site Committee rejected the Baker-Stein's building plans for their home and writer's studio in the Riva Ridge subdivision outside of Jackson, Wyoming.  The Baker-Steins alleged breach of contract, tortious breach of the covenant of good faith and fair dealing, intentional interference with a contract and prospective economic advantage, injunctive relief, and punitive damages. The Baker-Steins then filed a Complaint for Declaratory Judgment, requesting that the district court determine the meaning of the term "principal residence site" in the covenants, and whether the Baker-Steins must receive permission from the Site Committee before planting trees for landscaping.

[¶2]  The district court granted summary judgment in favor of the Appellees on several issues including the breach of contract claim and that the Baker-Steins must gain Site Committee approval before planting trees for landscaping.  Following a bench trial, the district court determined that the covenants intended to protect the landowners' views of the Tetons and interpreted "principal residence site" in a way that required complete invisibility between the homes in the Riva Ridge subdivision.  The Baker-Steins appeal the district court's decisions.  We affirm in part, and reverse and remand in part.

**ISSUES**

[¶3]  The Baker-Steins raise the following issues for our review:

> 1)  In seeking to interpret an ambiguous restrictive covenant, did the [d]istrict [c]ourt err when it disregarded the intent of the drafter in its legal analysis and adopted the Restatement (Third) of Property:  Servitudes § 4.1, which the [d]istrict court read to allow the court to focus on the intent of the collective property owners within the Riva Ridge subdivision rather than the intent of the drafters?

> 2)  Did the [d]istrict [c]ourt err when it granted summary judgment to the homeowners' association on [the Baker-Steins'] claim for damages?

> 3)  Did the [d]istrict [c]ourt err when it granted summary judgment to the homeowners' association on the issue of whether landscaping could be used as a visibility screen only if approved by the homeowners' association?

1

[¶4]   On December 19, 1996, Betty I. Lucas, Russell C. Lucas, James F. Lucas, Lynda E. Lucas, and Leeann K. Lucas (hereinafter collectively referred to as "the Declarant") signed a Declaration of Covenants, Conditions and Restrictions of Riva Ridge Tracts (covenants).  Riva Ridge is an approximately 365 acre area in Teton County that the Declarant divided into seven tracts.  Six of the tracts are approximately forty acres, while the seventh tract is just less than 118 acres.  In the covenants, the Declarant stated that the property within Riva Ridge "contains significant wildlife habitat and is of high scenic and natural value, and Declarant is adopting the following Covenants, Conditions and Restrictions to preserve and maintain the natural character and value of the Property [Riva Ridge] for the benefit of all Owners of the Property or any part thereof."  The covenants established the Riva Ridge Owners Association (the Association) of which every Riva Ridge tract owner is a member.  The Association is managed by a three member Board of Directors, and the Board members also serve as the Association's Site Committee.  The current members of the Board and Site Committee are Mr. Mueller, Mr. Campbell and Mr. Hussey.  One of the Site Committee's duties is to consider and act upon building plan proposals for homes in Riva Ridge.

[¶5]   As most covenants do, the Riva Ridge covenants specify and restrict certain aspects of the proposed homes in the development.  One such restriction addresses the visibility of the homes on the different tracts in the area.  That section of the covenants states:

> Section 4.  Site Design.
>
> (a)  Building Envelope.  In order to provide for the **maximum privacy and in order to maintain views from the principal residences on each of the Tracts without buildings or other structures in the foreground**, building envelopes are hereby established for each of the Tracts.  Each of the Tracts comprising the Property contains a **principal residence building site** which has been approved by Teton County as being in conformance with the skylining and scenic resource overlay regulations of Teton County.  These building sites have not been approved by Teton County for actual construction, however, each building site has been examined and an environmental assessment prepared and submitted to Teton County and the recommendations set forth in the environmental assessment must be followed in gaining specific approval of a building site from Teton County.  The

designated building sites for each of the individual Tracts comprising the Property are as described on Exhibit "H" attached hereto and by this reference made a part hereof. Building envelopes for each of the Tracts, with the exception of Tract G, shall consist of a contiguous four-acre parcel of any shape or configuration determined by the Owner of each of the Tracts and which building envelope shall contain within it the designated building site. The building envelope for Tract G shall consist of a contiguous ten (10) acre parcel of any shape or configuration determined by the Owner of the Tract and which building envelope shall contain within it the designated building site. In configuring the building envelope for each Tract, the designated building site shall not be relocated without the approval of the Site Committee after compliance with all of the requirements set forth hereinafter for relocation of building envelopes. . . . The location of building envelopes shall be submitted with the site plan upon submission of building plans for approval for construction. **No structure may be so constructed or placed within a building envelope so that it is visible from any principal residence site as designated on Exhibit "H", or from any principal residence site relocated** pursuant to the provisions of these Covenants, Conditions and Restrictions.

Exhibit H is a topographic map of the area that shows the seven different tracts and the acreage of each tract. Each tract contains a small square with the notation "Homesite" on it.

[¶6]   Article X, Section 8 of the covenants allows for the relocation of the building envelopes and the location of the "principal residence site" shown on Exhibit H with the Site Committee's approval under the following conditions:

(1)   No portion of a house or principal residence constructed at the approved relocated principal residence site shall be visible from any designated principal residence site on any other Tract of the Property.

(2)   The building envelope shall be so located surrounding the relocated principal residence site such that no structures constructed or to be constructed within the building envelope shall be visible from the designated principal residence site of any other Tract.

3

(3)  The Site Committee may, as a condition of approval of relocation, impose additional restrictions on structures within a relocated building envelope or designated site, such as, but not necessarily limited to, size limitations and height restrictions, and such additional conditions or restrictions shall have the force and effect of all initial provisions of these covenants.

[¶7]  The covenants also require Site Committee approval before a tract owner can alter any part of the tract from its natural state.  Specifically, Article VIII, Section 2(a) states:

. . . no excavation or other work which in any way alters any Tract from its natural or improved state existing on the date such Tract was first conveyed in fee by Declarants to an Owner shall be erected, placed, done or permitted to remain on any Structure or Tract until the plans, specifications and exterior material samples and color selections therefor have been approved in writing and a building permit has been issued by the Site Committee.

Additionally, Article VIII, Section 3(o) states:  "No on-site mining or other mineral extraction or Development activities shall be permitted on any Tract, including the removal of gravel; provided that excavation for construction, wildlife enhancement or landscape purposes may be permitted with the prior written approval of the Board."

[¶8]  The covenants were drafted by the Declarant's attorney, David Larsen.  During the process, Mr. Larsen and a land surveyor, Sean O'Malley, went to Riva Ridge to look at the general area of what would become the seven tracts in the development.  The two put a story pole on each of the tracts to make sure the plans would comply with county zoning regulations regarding scenic overlay and skylining.[1]  They also used the story poles to determine the visibility of potential development on each tract from each of the other tracts in the development.  They marked the designated spot where the story poles were placed on each tract with green fence posts, and those spots were marked on Exhibit H of the covenants as the "homesite" for the respective tract.

[¶9]  After the covenants were recorded, the Declarant began selling the tracts in Riva Ridge.  Homer Luther purchased Tract A in July of 1998 and thereafter built a home on the property.  Karla Tessler purchased Tract E and, according to Mr. Luther, in January

---

[1] A story pole is defined as:  "a pole cut to the proposed clear height between finished floor and ceiling and often marked with minor dimensions (as for door trims and dadoes) that is used especially by carpenters and bricklayers."  Webster's Third New Int'l Unabridged Dictionary (2002).

4

of 2000 requested permission from the Association to relocate the principal residence site for that tract. According to Mr. Luther, the Association approved that request and at some point in time Ms. Tessler built a home on Tract E. The house is not built on or near the original principal residence site shown as the "homesite" on Exhibit H of the covenants. Cody Mueller purchased Tract E from Ms. Tessler in 2007, and Susan and John Jackson purchased Tract A from Mr. Luther in 2011.

[¶10] The Baker-Steins purchased Tract B in December 2010, and they hired a Jackson architectural firm with prior experience designing homes in Riva Ridge to design their home and separate writer's studio. The Baker-Steins first submitted their plans to the Site Committee in November 2011, and despite submitting several amended proposals to address Site Committee concerns, the Site Committee rejected all versions of the plans. The Site Committee rejected the plans on the basis that some of the Baker-Steins' proposed home would be visible from some locations in the Mueller (being the same Mr. Mueller who is the president of the Association and on the Site Committee) and Jackson constructed homes, although those locations are not necessarily the "homesites" shown on Exhibit H of the covenants. The visibility from the Mueller and Jackson homes continued to be a problem even though the Baker-Steins changed the proposed height of their home from twenty-seven feet to twenty-two feet, while all of the other homes in the area are approximately thirty feet tall.

[¶11] The Baker-Steins' proposed resolution to the visibility problem was to plant trees to block their home from the Mueller's and Jacksons' view. However, the Site Committee informed the Baker-Steins that the covenants do not allow them to mitigate any visibility of the proposed structures by planting trees. Further, the Site Committee concluded that, based upon Article VIII, Section 2(a) and 3(r)(1), the Baker-Steins need Site Committee approval before planting any trees on the property.

[¶12] The Baker-Steins filed a Complaint for Damages and Injunctive Relief, claiming breach of contract, intentional interference with contract and prospective economic advantage, tortious breach of the covenant of good faith and fair dealing, and seeking injunctive relief and punitive damages. They also filed a Complaint for Declaratory Judgment wherein they sought a declaration from the district court regarding whether the term "principal residence site" in the covenants required that the Baker-Steins' proposed home be invisible from anywhere in the Mueller and Jackson homes, and whether the covenants require Site Committee approval before the Baker-Steins can plant trees on the property. The Appellees submitted a counterclaim for declaratory relief seeking a declaration from the district court that the authority to issue permits is vested in the Board of Directors and Site Committee, that the court does not have the authority to amend the Association's documents, that decisions regarding plan submissions are within the discretion of the Site Committee, and that the Site Committee is the sole entity charged with enforcing, interpreting, and applying the governing documents of the Riva Ridge Development.

5

[¶13] Each party filed a motion for partial summary judgment. Of significance to this appeal, the district court determined that the phrase "principal residence site" in the covenants was ambiguous and, thus, a question of fact existed regarding the intent of the drafter and the meaning of the visibility restriction. The district court concluded that, with respect to landscaping, the covenants as a whole were unambiguous and required that property owners seek permission from the Site Committee before doing any landscaping, including planting trees. Finally, the district court granted summary judgment in favor of the Appellees on the breach of contract claim, finding that the Baker-Steins had failed to show a provision in the covenants that would allow them to recover damages from the Appellees.

[¶14] Thereafter, the district court held a bench trial to determine the meaning of "principal residence site." The court received testimony from many witnesses, including Mr. Larson, Mr. O'Malley, Mr. Stein, Mr. Mueller, Mr. Campbell, and the Jacksons. The court also heard the testimony of the architect who designed the Baker-Steins' home, an architect who was assisting the Site Committee, and the parties submitted the deposition testimony of Mr. Luther.[2] After considering all of the evidence, the district court determined that the residents of Riva Ridge believe the covenants require complete invisibility between the homes, and because the residents bought their homes with that expectation, that perceived benefit should be protected. Although the court had determined on summary judgment that landscaping required Site Committee approval, it reaffirmed its decision in that respect in the order following the bench trial. The Baker-Steins timely filed a notice of appeal.

## DISCUSSION

### *Meaning of "Principal Residence Site"*

[¶15] The Baker-Steins argue the district court improperly concluded that the covenants require all homes in Riva Ridge be invisible from one another. Specifically, the Baker-Steins submit that when interpreting the ambiguous phrase "principal residence site," the district court improperly gave more consideration to the current homeowners' belief of what the covenants mean than to the testimony of Mr. Larson, who actually wrote the covenants.[3]

---

[2] While the district court relied upon Mr. Luther's deposition in its order, and the parties, particularly the Appellees, refer to it in their briefs, neither party designated the deposition as part of the record on appeal. The documents that disclosed which portions of the deposition the parties wanted the district court to consider are in the record on appeal, but without the actual deposition this Court cannot consider the substance of the deposition.

[3] In addition to "principal residence site," the covenants refer to "building site," "designated building site," and "principal residence building site." However, it is clear from the entirety of the covenants that

6

[¶16]  When reviewing a bench trial, this Court reviews the trial court's findings of fact for clear error and its conclusions of law *de novo*.  *Moore v. Wolititch*, 2015 WY 11, ¶ 9, 341 P.3d 421, 423 (Wyo. 2015).  Covenants are contractual in nature and will be interpreted in accordance with contract law principles.  *Stevens v. Elk Run Homeowners' Ass'n*, 2004 WY 63, ¶ 12, 90 P.3d 1162, 1165-66 (Wyo. 2004).  The construction and interpretation of a contract is a matter of law and, thus, will be reviewed *de novo*.  *Id*., ¶ 12, 90 P.3d at 1166.  Here, the district court determined at the summary judgment stage that the phrase "principal residence site" was ambiguous, requiring the resolution of a factual issue at trial.[4]  Neither party claims that conclusion was erroneous.  However, "[r]eviewing courts are free to make a determination as to the existence of ambiguity whether or not the parties agree one way or the other and whether or not the trial court has reached a conclusion one way or the other."  *Cathcart v. State Farm Mut. Auto Ins. Co.*, 2005 WY 154, ¶ 18, 123 P.3d 579, 588 (Wyo. 2005).  This Court reviews *de novo* the question of whether language in the covenants is ambiguous.  *Hutchison v. Hill*, 3 P.3d 242, 245 (Wyo. 2000).

[¶17]  At the outset, it is important to address a stance the Appellees have taken in the district court and on appeal.  They argue that the courts should not interfere with the Site Committee's interpretation of the covenants unless that interpretation is unreasonable.  In support of that proposition, they cite *McHuron v. Grand Teton Lodge Co.*, 899 P.2d 38 (Wyo. 1995); *Hammons v. Table Mt. Ranches Owners Ass'n, Inc.*, 2003 WY 85, 72 P.3d 1153 (Wyo. 2003); and *Dwan v. Indian Springs Ranch Homeowners Ass'n, Inc.*, 2008 WY 74, 186 P.3d 1199 (Wyo. 2008).  In each of those cases, we discussed whether the respective homeowners associations acted reasonably in denying the homeowners' building requests.  However, in each case there was never a question about the *meaning* of the covenants; instead, the question was whether the associations reasonably *applied* them.  If we utilized a reasonableness standard in covenant interpretation, there would be no reason to have covenants in the first place.  The meaning of the covenants could change depending upon the various members of the Site Committee and what they believe the covenants should mean.  All homeowners—existing or potential—would be faced with a moving target when trying to comply with the covenants.  Therefore, while a reasonableness standard is appropriate when reviewing an association's or committee's application of discretionary decisions afforded by the covenants, we interpret the language and meaning of the covenants in accordance with the principles of contract law.  *See Star Valley Ranch Ass'n v. Daley*, 2014 WY 116, ¶ 12, 334 P.3d 1207, 1210 (Wyo. 2014).

---

these phrases are being used synonymously.  For the sake of clarity, we will refer to the phrase as used in the specific language in question—"principal residence site."

[4] The district court referred to the "principal residence site" as the "primary residence site."  While the covenants never use the phrase "primary residence site," it is clear the district court is referring to the "principal residence site."

[¶18] The method we use in interpreting covenants is well established:

> We seek to determine and effectuate the intention of the parties, especially the grantor(s), as it may appear or be implied from the instrument itself. *See American Holidays, Inc. v. Foxtail Owners Ass'n*, 821 P.2d 577, 579 (Wyo. 1991); *Bowers Welding & Hotshot, Inc. v. Bromley*, 699 P.2d 299, 303 (Wyo. 1985); *Kindler [v. Anderson*, 433 P.2d 268,] 270-71 [(Wyo. 1967)]. Intention of the parties is to be determined from the entire context of the instrument, and not from a single clause. *American Holidays*, at 579; *Bowers Welding & Hotshot*, at 303; *Kindler*, at 270-71. Where the language imposing the restriction(s) is clear and unambiguous, we construe it according to its plain and ordinary meaning without reference to attendant facts and circumstances or extrinsic evidence, and the rule of strict construction does not apply. . . . *American Holidays*, at 579; *Kincheloe v. Milatzo*, 678 P.2d 855, 859 (Wyo. 1984); *Kindler*, at 271.

*Id.*, ¶ 12, 334 P.3d at 1210 (quoting *Anderson v. Bommer*, 926 P.2d 959, 961-62 (Wyo. 1996) (alterations in original). Further, "restrictions upon the use of land are not favored and, accordingly, such restrictions will not be extended by implication." *Stevens*, ¶ 13, 90 P.3d at 1166.

[¶19] The Declarant expressly stated that the purpose of the Riva Ridge covenants is "to preserve and maintain the natural character and value of the Property for the benefit of all Owners of the Property or any part thereof." In order to further this purpose, the covenants include a section regarding the visibility between structures in Riva Ridge. That section states: "In order to provide for the maximum privacy and in order to maintain views from the principal residences on each of the Tracts without buildings or other structures in the foreground, building envelopes are hereby established for each of the Tracts." The section goes on to explain that each tract has a "principal residence site" which has been approved by Teton County as being in conformance with skylining and scenic resource overlay regulations. Further, it states that the "principal residence site" for each of the individual tracts is shown on a topographic map of the area designated at Exhibit H. Under the covenants, "No structure may be so constructed or placed within a building envelope so that it is visible from any principal residence site as designated on Exhibit 'H', or from any principal residence site relocated pursuant to the provisions of these Covenants, Conditions, and Restrictions."

[¶20] The Baker-Steins argue that the phrase "principal residence site" refers to a specific point on the ground, and that specific point is shown on Exhibit H. Thus, their

8

proposed home does not need to be invisible from anywhere in the Mueller and Jackson homes, but only from the specific principal residence sites on the Mueller and Jackson tracts as shown on Exhibit H. The Appellees argue that the restricted visibility from the "principal residence site" protects the view from anywhere within a "principal residence." They base this argument on the fact that the building envelopes were developed to "provide for the maximum privacy and in order to maintain views from the *principal residences* on each of the Tracts, without buildings or other structures in the foreground[.]" (Emphasis added). Thus, it is the Appellees' position that "principal residence" modifies the word "site" to mean that the covenants are referring to "the site of a 'single family residential Structure.'"

[¶21] The language in the covenants about visibility between structures on the tracts is straightforward and clear. It unambiguously requires that a structure may not be visible from any "principal residence site." The covenants then unambiguously state that the "principal residence site" of each tract is shown on Exhibit H. On Exhibit H, each tract includes a small box which denotes the location of the "homesite." Exhibit H contains no other possible "principal residence site" for each tract. Thus, the plain language of the covenant states that structures on other tracts may not be visible from that specific location— the "homesite" or principal residence site—as established on Exhibit H. In order to adopt the Appellees' interpretation of "principal residence site," this Court would have to deviate from its established procedure in interpreting covenants. We decline to do so and address the deficiencies in Appellees' interpretation below.

[¶22] First, to accept the Appellees' interpretation would mean that "principal residence site" and "principal residence" essentially have the same meaning. The phrase "principal residence site" is not defined in the covenants. However, "principal residence" is defined as "the single family residential Structure, constructed on any Tract of the Property . . . ." At times, the two phrases are used within the same sentence, signifying that the terms are not synonymous. For example, when discussing the relocation of the building envelope, the covenants state, "No portion of a house or principal residence constructed at the approved relocated principal residence site shall be visible from any designated principal residence site on any other Tract of the Property." If the phrase "principal residence site" means the same thing as the principal residence, as the trial court ruled, the Declarant would have stated that no portion of a principal residence shall be seen from any other principal residence. The Declarant did not do so and, instead, used different and distinct phrases to describe two different and distinct things.

[¶23] Further, the Appellees' interpretation of the "principal residence site" has no meaning unless a "principal residence" has already been built on a tract. This conclusion is contrary to the explicit role the "principal residence site" plays in the overall covenant scheme. The "principal residence sites" are the only locations of significance that were designated by the Declarant at the time the covenants were written. The covenants require the tract owners to determine the placement and shape of the building envelopes,

9

simply requiring that they be a certain size and include within it the "principal residence site" as shown on Exhibit H. Any structures on the tract must be placed within the building envelope. Therefore, one cannot even begin to contemplate where a "principal residence" may be built without first recognizing the existing "principal residence site" shown on Exhibit H. To accept the Appellees' interpretation that the "principal residence site" is simply the site of the principal residence would render this important part of the covenants meaningless. *Shaffer v. Winhealth Partners*, 2011 WY 131, ¶ 17, 261 P.3d 708, 713 (Wyo. 2011) ("Our rules of contract interpretation require us to give effect to each word if possible, and we strive to avoid construing a contract so as to render one of its provisions meaningless, because each provision is presumed to have a purpose.") (Internal quotations and quotation marks omitted).

[¶24] Acceptance of the Appellees' interpretation would also result in owners who build their homes later in time being subjected to far more arduous standards than those who built their homes earlier. Using the Appellees' logic, the first owner/builder in the development would not have to worry about the location of his home at all because there are no other homes in the area from which the first owner's home may be visible. The second owner/builder would need to concern himself with only the first owner's home because that is the only site of a home in the development. However, the sixth owner/builder has to be concerned with whether his home will be visible from anywhere in the five other homes in the area. This is not what the covenants require. The Declarant clearly stated that the covenants were established for the benefit of ***all*** owners of tracts within Riva Ridge. This fair treatment is further expressed in the covenants by requiring that no structure be visible from "***any*** principal residence site as designated on Exhibit 'H'. . . ." This phrase does not limit visibility from existing homes; instead, it applies to all principal residence sites regardless of whether a home is built on the tract. The homesites notated on Exhibit H existed before any houses were built in Riva Ridge, thus putting all tracts on equal footing when it comes to the visibility requirements of the covenants.

[¶25] The Appellees argue that interpreting "principal residence site" to mean something less than the site where the principal residence is built will frustrate the purposes of the covenants; specifically, "to provide for the maximum privacy and in order to maintain views from the principal residences on each of the Tracts without buildings or other structures in the foreground . . . ." They contend this requires complete invisibility between the homes in Riva Ridge.[5] We disagree. "Maximum privacy" is not

_____

[5] The district court relied upon various homeowner's testimony, including Mr. Mueller's and the Jacksons', as well as Mr. Luther's deposition to reach the conclusion that the homeowners expected complete invisibility between the homes when they purchased their tracts, and that the Association utilized a "long standing fundamental principle that new homes should not be visible from existing homes." However, the record contains evidence that calls that principle into question—specifically that the house on Tract D, which is owned by Robert Ross, is visible from the house located on Tract C, which is owned by Site Committee member John Campbell, and vice versa. Because the covenants are

synonymous with absolute privacy. "Maximum" is defined as: "The greatest possible quantity or degree." American Heritage Dictionary (5th ed. 2015), https://ahdictionary.com. Absolute is defined as: "1. a. Unqualified in extent or degree; total. . . b. Not limited by restrictions or exceptions[.]" *Id*. Here, the Declarant sought as much privacy as possible for the owners in Riva Ridge, but could not guarantee absolute or total privacy. At the time the covenants were established, there were no homes in Riva Ridge. The Declarant could not know what kind of homes the future owners would decide to build, how large the homes would be, or where exactly the homes would be built on each tract. Without knowing all of that information, it was impossible for the Declarant to guarantee complete invisibility. Instead, they guaranteed invisibility from the one area on each tract that was established at the time the covenants were written—the "principal residence site." Therefore, an interpretation that does not guarantee absolute or total invisibility, but allows for as much privacy as possible under the circumstances, does not conflict with the intent of the Declarant or the purpose of the covenants.

[¶26] Finally, the Appellees point out that the "principal residence site" cannot be a specific location on the ground because Exhibit H and the covenants do not contain survey information or give a legal description for each site. It is true that Exhibit H does not contain survey information; however, we do not believe that means the "principal residence site" for each tract as marked on Exhibit H does not occupy a precise area on each tract. Exhibit H clearly shows each distinct tract, includes information regarding the topography of each tract, and the Appellees acknowledge that Exhibit H is drawn to scale. Additionally, while we reached our determination regarding the unambiguous meaning of the covenants without considering the evidence presented at trial, some of that evidence does demonstrate that the precise location of a "principal residence site" can be determined. For example, the Baker-Steins produced an exhibit that shows each of the tracts, where each "principal residence site" is located, and where the "principal residence" is built on each tract. Mr. O'Malley testified that he reviewed the land surveying that had been done in Riva Ridge to create and identify the "principal residence sites" on Exhibit H. Mr. Larson and Mr. O'Malley both testified that they marked the "principal residence site" on each tract with a green fence post. Therefore, the precise location of the "principal residence site" can be determined in order to properly enforce the covenants.

[¶27] We find that the term "principal residence site" for each tract unambiguously refers to the specific areas illustrated on Exhibit H and identified thereon as "homesite." Therefore, to comply with the covenants, the Baker-Steins' proposed home cannot be

---

unambiguous, this Court has not relied upon this information in interpreting the covenant's meaning; however, the information does call into question the proposition that the Association has always understood that the covenants require complete invisibility between houses in Riva Ridge.

visible from that specific area on the Jacksons' and Mueller's property.[6] So long as the proposed home is invisible from those specific locations on the ground of the other tracts, any visibility from other parts of the homes does not violate the covenants.

### *Damages Claim*

[¶28]  The Baker-Steins sought damages for breach of contract against the Appellees based on the Site Committee's decisions not to approve the Baker-Steins' building plans. The district court granted summary judgment in favor of the Appellees, determining that the Baker-Steins had not identified any provision of the covenants that would allow them to seek damages.

[¶29]  When reviewing the district court's decision to grant summary judgment:

> We have said that the "propriety of granting a motion for summary judgment depends upon the correctness of the dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law." *Dwan v. Indian Springs Ranch Homeowners Ass'n*, 2008 WY 74, ¶ 6, 186 P.3d 1199, 1201 (Wyo. 2008) (citing W.R.C.P. 56(c)).  Summary judgment involves a purely legal determination, and accordingly, we undertake *de novo* review of the district court's decision.  *Glenn v. Union Pacific R.R. Co.*, 2008 WY 16, ¶ 6, 176 P.3d 640, 642 (Wyo. 2008).  "The facts are reviewed from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record." *Brumbaugh v. Mikelson Land Co.*, 2008 WY 66, ¶ 11, 185 P.3d 695, 701 (Wyo. 2008).

*Star Valley Ranch*, ¶ 11, 334 P.3d at 1211.

[¶30]  The district court determined as a matter of law that the Baker-Steins could not prevail on their breach of contract claim.  In doing so, the court relied upon this Court's decision in *Dwan v. Indian Springs Ranch Homeowners Ass'n, Inc.*, 2010 WY 72, 232 P.3d 1183 (Wyo. 2010) (*Dwan II*).  In *Dwan II*, the plaintiff sought damages against the

---

[6] We recognize that the parties may encounter difficulties when determining the "principal residence site" on Tract E, which is owned by Mr. Mueller.  The original owner of that tract requested that the "principal residence site" be relocated.  While the request was approved by the Site Committee, the record is not clear on whether the request and approval conformed to the relocation requirements in the covenants.  If the previous owner simply built the house in a different area and did not establish a new "principal residence site," the original site shown on Exhibit H will be the relevant point of visibility for the Baker-Steins' proposed home.

homeowners association for breach of contract after this Court determined the association had unreasonably denied the plaintiff's application to build an addition on her home. *Id.*, ¶ 5, 232 P.3d at 1184. The district court granted summary judgment in favor of the association and we affirmed. *Id.*, ¶¶ 5, 9, 232 P.3d at 1184, 1186. We explained that, while covenants are contractual in nature, a homeowner is not necessarily entitled to recover contract damages against an association. *Id.*, ¶ 9, 232 P.3d at 1186. The plaintiff had failed to point to any provision in the covenants that would allow her to claim damages against the association; thus, we concluded that she failed to state a viable cause of action for damages. *Id*.

[¶31] Here, the district court determined that, like the plaintiff in *Dwan II*, the Baker-Steins failed to identify a provision in the covenants that would entitle them to seek damages against the Appellees. However, two different sections of the covenants clearly contemplate that members of the board and site committee may be liable to owners in some circumstances. Article IV, Section 5 states:

> Section 5. Limited Liability of Board of Directors, etc.
> Members of the Board and their officers, assistant officers, agents and employees acting in good faith on behalf of the Association:
>
> (1) shall not be liable to the Owners as a result of their activities as such for any mistake of judgment, negligence or otherwise, except for their own willful misconduct or bad faith;
>
> (2) shall have no personal liability in contract to an Owner or any other person or entity under any agreement, instrument or transaction entered into by them on behalf of the Association in their capacity as such;
>
> (3) shall have no personal liability in tort to any Owner or any person or entity, except for their own willful misconduct or bad faith;
>
> (4) shall have no personal liability arising out of the use, misuse or condition of the Property which might in any way be assessed against or imputed to them as a result of or by virtue of their capacity as such.

Article VI, Section 8 of the covenants contains a liability clause that is specific to the Site Committee:

> Section 8. Liability. Neither the Site Committee nor any member thereof shall be liable to the Association or to any Owner for any damage, loss or prejudice suffered or claimed on account of (a) the approval of any plans, drawings

13

and specifications, whether or not defective, (b) the construction or performance of any work, whether or not pursuant to approved plans, drawings and specifications, (c) the Development, or manner of Development, of any property within the Property, or (d) the execution and filing of an estoppel certificate pursuant to Section 7 above, of this Article, whether or not the facts therein are correct; **provided, however, that such member has, with the actual knowledge possessed by him, acted in good faith.**

[¶32] These provisions exempt the Board of Directors, Site Committee, and members thereof from liability in certain circumstances, but those circumstances require that the underlying action be done in good faith. The logical extension of that limitation is that liability may exist if the action is done in bad faith. While Section 5 does not use the specific term "damages," one cannot be liable or responsible for something that does not incur damages. Section 8, however, does specifically state the Site Committee and its members shall not be liable to any owner for damages, so long as the Committee and/or members were acting in good faith. Thus, if the Site Committee or one of its members acts in bad faith, it could be liable for the damages sustained by the owner.

[¶33] The Baker-Steins' allegations are that Mr. Mueller, Mr. Campbell and Mr. Hussey, in their individual capacities and as members of the Site Committee, acted in bad faith when they denied the Baker-Steins' building plans. If the Baker-Steins are able to prove bad faith, they may be entitled to damages as this is the type of conduct for which the covenants do not protect the Board of Directors, Site Committee, or its members from liability. Therefore, the district court erred in granting summary judgment to the Appellees on the basis that the covenants do not provide the Baker-Steins a cause of action.

[¶34] The Appellees argue that the Baker-Steins failed to present any evidence of bad faith at the time the district court granted summary judgment, did not litigate the issue of bad faith at the trial, and are precluded from doing so now because the district court determined the Site Committee's interpretation of the covenant was reasonable. The Appellees also seem to suggest that because the district court determined the Site Committee's interpretation was reasonable, that shows the Committee acted in good faith. We disagree.

[¶35] The fact that the district court held a bench trial and ultimately ruled in favor of the Appellees does not preclude the Baker-Steins from litigating the issue of bad faith on remand. All of the claims that would have required the Baker-Steins to show bad faith at trial had been resolved by the district court at summary judgment. Thus, the Baker-Steins had no reason to present evidence regarding bad faith at trial, and to do so may have been susceptible to a proper objection by the Appellees.

14

[¶36]  The Appellees, however, argue that the Baker-Steins did present evidence at trial that could be indicative of bad faith, such as Mr. Mueller's potential conflict of interest and the Site Committee's amendment to the by-laws after the Baker-Steins filed the complaint.  The Appellees assert that because that evidence was presented and the district court still determined the Site Committee acted reasonably, the Baker-Steins are foreclosed from litigating the bad faith claim.  As pointed out above, the issue at trial did not involve whether the Site Committee and its members acted in good faith—the issue was what does "principal residence site" mean within the covenants.  While the evidence could show bad faith, at the time of trial the evidence was used in an attempt to discredit Mr. Mueller's testimony regarding the interpretation of the covenants.  Simply because the Baker-Steins presented some evidence that may be helpful to show bad faith does not mean they had the opportunity to fully and fairly develop the facts on the bad faith claim, and that fact should not preclude them from doing so on remand.

[¶37]  Further, the Appellees' interpretation of the covenants was erroneous.  Therefore, any finding by the district court that the Site Committee's actions were reasonable based upon its incorrect interpretation of the covenants is also erroneous and cannot be used to justify the Appellees' actions.  Additionally, the district court never made a determination of whether genuine issues of material fact existed regarding bad faith.  In light of the facts that Mr. Mueller is the president of the Riva Ridge Owners Association, his home happens to be one from which the Baker-Steins' proposed home is visible, the Site Committee (including Mr. Mueller) rejected the Baker-Steins' building plans on more than one occasion based on an incorrect interpretation of the covenants, and the Site Committee's actions to amend the Committee by-laws and rules after this litigation commenced, we believe reasonable minds could differ regarding the Site Committee's motives in denying the Baker-Steins' building permit.  Therefore, genuine issues of material fact exist to determine whether the Appellees acted in bad faith on the breach of contract claim and the district court's order granting summary judgment was improper.

### *Landscaping Provision*

[¶38]  In their Complaint for Declaratory Judgment, the Baker-Steins sought a determination from the district court that the covenants do not require an owner to seek approval from the Site Committee before planting trees on his or her tract.  The Baker-Steins moved for summary judgment on this claim, arguing that the covenants only contain protections for existing vegetation and trees and does not prohibit planting new trees.  The Appellees responded and agreed that the covenants are unambiguous, but argued that they unambiguously require Site Committee approval before planting trees.  The district court agreed with all parties that the covenants were unambiguous, but agreed with the Appellees that, as a matter of law, the covenants require that an owner seek Site Committee approval before planting trees.

15

[¶39] On appeal, the Baker-Steins argue the district court's decision was erroneous; however, the basis of that argument is not entirely clear. Instead of discussing how the decision was incorrect as a matter of law, the Baker-Steins argue "the Site Committee's prohibition on using landscaping as screening is unreasonable, and there were disputed material facts that should have precluded summary judgment." The latter argument is particularly peculiar considering it was the Baker-Steins who moved for summary judgment on the claim, and all parties agreed the covenants were unambiguous, albeit reaching different conclusions regarding their meaning. Although the issue had not been raised, the district court determined, after the trial, that the Site Committee's denial of the Baker-Steins' request to use trees as landscaping screening was reasonable. However, the Baker-Steins clearly are challenging the district court's decision in the summary judgment order. Because the Baker-Steins' argument that there are genuine issues of material fact necessitating a trial are being raised for the first time on appeal, we refuse to consider them. *See Davis v. City of Cheyenne*, 2004 WY 43, ¶ 26, 88 P.3d 481, 490 (Wyo. 2004). Therefore, we will limit our review to the legal question presented to the district court—do the covenants require Site Committee permission before an owner can plant trees on his or her tract?

[¶40] As discussed above, the interpretation of a covenant is a question of law that is reviewed *de novo*. *Stevens*, ¶ 12, 90 P.3d at 1165-66. Additionally, we review a district court's decision to grant summary judgment *de novo*. *Star Valley Ranch*, ¶ 11, 334 P.3d at 1211.

[¶41] We agree with the district court that the covenants require that the owners receive approval from the Site Committee before planting trees on a tract. Generally, the covenants require Site Committee approval for making changes or improvements to the tract that will alter the natural state of the tract. For example, Article VIII, Section 2 states:

> (a) No building, Structure, sign, fence, refinishing or improvement of any kind shall be erected, placed or permitted to remain on any Structure or Tract, and no excavation or other work which in any way alters any Tract from its natural or improved state existing on the date such Tract was first conveyed in fee by Declarant to an Owner shall be erected, placed, done or permitted to remain on any Structure or Tract until the plans, specifications and exterior material samples and color selections therefor have been approved in writing and a building permit has been issued by the Site Committee.

Further, Article VIII, Section 3(r)(1) specifically prohibits the removal of trees except in limited circumstances. Of particular importance, Article VIII, Section 3(o) states:

16

(o)  No on-site mining or other mineral extraction or Development activities shall be permitted on any Tract, including the removal of gravel; provided that excavation for construction, wildlife enhancement or landscape purposes may be permitted with the prior written approval of the Board.

The term "Development" is defined in the covenants as:  "any alteration of the natural land surface, and all buildings, Structures or other site improvements on the Property." Excavate is not defined in the covenants, but the everyday definition of the term includes "to remove by digging or scooping out." *American Heritage Dictionary* (5th ed. 2015), https://ahdictionary.com.

[¶42]  Planting trees is a common landscaping procedure that can improve a tract of land on the property.  That process cannot be done without altering the existing natural state of the tract and engaging in some excavation when preparing a hole the tree will occupy. While this conduct may be minimal compared to other excavations and alterations that may occur on the tracts, it is excavation for landscaping nonetheless, and the covenants clearly require Site Committee permission before proceeding.  Therefore, we affirm the district court's conclusion that an owner must seek the Site Committee's approval before planting trees on his or her tract.

**CONCLUSION**

[¶43]  The phrase "principal residence site" in the Riva Ridge covenants is unambiguous and refers to a precise area of land on each tract, and those areas are shown on Exhibit H of the covenants.  Thus, the covenants require that a "principal residence" be invisible only from that designated area on each tract and not from any other location within a "principal residence" on the other tracts.  Additionally, the district court erroneously dismissed the Baker-Steins' breach of contract claim on summary judgment.  The covenants provide that the Appellees may be liable to the Baker-Steins for damages if they acted in bad faith.  A genuine issue of material fact exists regarding whether the Appellees acted in bad faith; therefore, summary judgment was inappropriate.  However, the district court properly determined that the Baker-Steins must seek permission from the Site Committee before planting any trees on their tract.

[¶44]  Affirmed in part, and reversed and remanded in part.

**FORGEY, District Judge,** concurring in part and dissenting in part.

[¶45] I concur with the majority to the extent that it affirms the district court's interpretation of the Riva Ridge covenants' "landscaping provision," but I otherwise respectfully dissent.

[¶46] In my opinion, the remaining sections of the covenants can also, as a matter of law, unambiguously be interpreted in the same way as the district court ultimately interpreted the covenants. It is clear from the plain language of the covenants that: 1) Riva Ridge "contains significant wildlife habitat and is of high scenic and natural value" and the covenants were adopted "to preserve and maintain the natural character and value of the Property for the benefit of all Owners of the Property or any part thereof;" and 2) structures are to be built within a designated area on each Riva Ridge tract "to provide for the maximum privacy and in order to maintain views from the principal residences on each of the Tracts without buildings or other structures in the foreground," including that "[n]o structure may be so constructed or placed within a building envelope so that it is visible from any principal residence site as designated on Exhibit 'H', or from any principal residence site relocated . . . ."

[¶47] These provisions, when read together and in a manner that gives effect to all of the applicable language, require a broader interpretation of the covenants than the interpretation adopted by the majority. There is no dispute that the drafters of the covenants intended and anticipated that multi-story structures up to thirty feet high, such as principal residences, would be built on Riva Ridge tracts.[7] The majority's interpretation focuses on the term "principal residence site" and limits it to a point or points on the ground that largely exclude areas within a properly-built principal residence where one would expect to have a view "without buildings or other structures in the foreground." That interpretation ignores and renders meaningless the other language contained in the same section of the covenants, is contrary to the stated purpose of the covenants, and will derogate the unobstructed views that all of the Riva Ridge property

---

[7] The covenants contain a "height restriction" and "design standards such as building heights and roof pitches" that according to the district court "would serve to define the approximate spatial location of a prospective building as more than just a point on the ground." Extrinsic evidence confirms this in that the attorney who drafted the covenants acknowledged that a principal residence "would be larger than a one-dimensional point on the ground, as a three-dimensional structure up to 30 feet high" and the majority mentions that "all of the other homes in the area are approximately thirty feet tall." Knowing this, the developers initially used the "story poles" to establish home sites, but at that time "there were no roads in the subdivision and [there was] no practical way to erect towers or other equipment to replicate the approximate height of homes"—"there were practical limits on what the surveyors and engineers could determine when the project was planned" and they simply "could not determine the height and precise locations of houses that would be built in the building envelopes and encompassing the 'designated sites' depicted in Exhibit H."

18

owners bargained for.[8]  "Maximum privacy" means what the covenants say it does—"views from the principal residences on each of the Tracts without buildings or other structures in the foreground."[9]

[¶48]  The majority's interpretation will allow the Baker-Steins to build structures on their tract that are visible in the foreground of two other Riva Ridge property owners' principal residences and minimizes the impact that such an interpretation will have on the other Riva Ridge property owners.  The Baker-Steins may have less flexibility in locating their proposed structures than Riva Ridge property owners who have already built structures on their properties, but the instant case is not one in which the covenants, as I interpret them, would deprive the Baker-Steins from using their property as they intend.  The design the Baker-Steins submitted to the Riva Ridge Site Committee included a home and detached writer's studio expected to cost between five and six million dollars.  As the district court concluded, the Baker-Steins

> are not denied the right to build their home.  They are able to build their home if the design is modified to comply with the visibility restriction.  Testimony was received that [ ] only the top one to two feet of the [proposed] home were visible, requiring the home to be either lowered, whether in overall height or by digging in to the site, or moved a few feet to the west.

[¶49]  I would further find that the district court properly granted summary judgment to the Appellees on the Baker-Steins' breach of contract claim.  Even if the Riva Ridge covenants allow the Baker-Steins to pursue such a cause of action in this case, the only evidence of "bad faith" referenced by the majority in holding that "reasonable minds could differ regarding the [Riva Ridge] Site Committee's motives in denying the Baker-Steins' building permit" and "genuine issues of material fact exist to determine whether the Appellees acted in bad faith on the breach of contract claim" is as follows: 1) the Site Committee "rejected all versions" of the Baker-Steins' building plans because "some of the Baker-Steins' proposed home would be visible from some locations" in two adjoining property owners' constructed homes; 2) this was based on an "incorrect interpretation of the covenants;" 3) a member of the Site Committee that rejected the Baker-Steins' building plans owned property adjoining the Baker-Steins' property and the Baker-

---

[8] For example, the district court found that the "low density and unique scenic qualities of the Riva Ridge tracts results in a uniquely high value for each tract.  A neighboring landowner [to the Baker-Steins] . . . paid $19 million for their tract with an existing home."

[9] Indeed, the district court found the covenants to be "an intricate scheme for ensuring that the structures, roads, utilities, and other signs of human presence on each property are hidden, as much as possible, from the other properties in the subdivision."

19

Steins' proposed home would be visible from that owner's principal residence; and 4) the Site Committee sought to "amend the Committee by-laws and rules after this litigation commenced." These grounds are insufficient, as a matter of law, to establish "bad faith," particularly considering that the Site Committee, in my opinion, relied on a correct interpretation of the covenants in denying the Baker-Steins' building plans. There are, accordingly, no genuine issues of material fact regarding the Baker-Steins' breach of contract claim, and the Appellees are entitled to a judgment on the claim as a matter of law.

[¶50] For these reasons, I would affirm the district court in all respects. My analysis differs somewhat from that of the district court, but "we may affirm the district court upon any valid basis appearing in the record." *Arnold v. Day*, 2007 WY 86, ¶ 14, 158 P.3d 694, 698 (Wyo. 2007).